# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

---

CARS (CITIZENS AGAINST RETAIL SPRAWL), by GEORGE CIANCIO, its
President, GEORGE J. CIANCIO, GEORGE C. FRANKE,
LAWRENCE F. HELMINIAK, DAVID & MARY ALYS KRATZKE,
SHARON CRAMER & LESLIE MORRIS,
BRIAN & HELEN BORZYNSKI, LUCILLE & DENIS MARSH,
CAROLYN L. BAKER, MARY CICH, ROBERT J. SMACZNIAK,
JEROME J. KUCHARSKI, JERRY & IDA SAWYER, NANCY PIENIAZEK,
TERRENCE & KATHLEEN RICHARD, JAMES P. HEISLER,
RONALD J. SZYPAJLO, STEPHEN & LUCILLE STAWICKI,
RUTH & NORMAN JOHNSON, CARLEEN BLAKE RYAN,
GARY & MARIETA RONALD, JOY THRUN,
WALTER & VIRGINIA WOJDYLA, FRANK & ANTOINETTE VOLPE,
FRANK & MARLENE TODARO and
ENRICO & DOMENICA BENEDETTI,

**COMPLAINT**

**Civ. Act. No.**

Plaintiffs,

-against-

THE UNITED STATES ARMY CORPS OF ENGINEERS,
UNITED STATES OF AMERICA,
BELLA VISTA GROUP, INC., NEC TRANSIT WILLIAM, LLC,
OPCO, INC., JOHN A. MARTZOLF & CAROLYN M. MARTZOLF, h/w,

Defendants.

---

       The Plaintiffs, by their attorney, DAVID J. SEEGER ESQ., state for their
Complaint:

      1.      This Complaint presents six claims for relief, all of which have to do with
whether the non-federal Defendants are in compliance with the Clean Water Act at a
proposed development site located on the northeast corner of Transit Road and William
Street in the Town of Lancaster, Erie County, New York.

## INTRODUCTION

2.      This is a civil action for injunctive relief and penalties brought pursuant to

§309(b) and (d) of the Clean Water Act (the "Act" or "CWA"), 33 U.S.C. §1319(b) and

(d), against the non-federal Defendants ("NFDSs") for the discharge of pollutants without

a permit in violation of §301 of the CWA, 33 U.S.C. §1311, and for violations of the

conditions of the State Pollution Discharge Elimination System ("SPDES") permit issued

pursuant to §402 of the CWA, 33 U.S.C. §1342, regulating  discharge of pollutants with

stormwater generated at construction projects.  This action is brought under the citizen

suit provision of the Federal Water Pollution Control Act (commonly known as the Clean

Water Act and hereinafter referred to as the Act), 33 U.S.C. § 1365. Defendants have

discharged and continue to discharge pollutants to the waters of the United States without

permits required by 33 USC §§1342 & 1344, and in noncompliance with a general permit

which Defendants untimely obtained after prolonged, unpermitted construction activities

in violation of §301(a) of the Act, 33 U.S.C. §1311(a). Plaintiff seeks a declaratory

judgment, injunctive relief, the imposition of civil penalties and the award of costs,

including attorney and expert witness fees.

3.      This is also a civil action for declaratory and injunctive relief brought

against the federal Defendants under the Administrative Procedure Act, including 5 USC

§706(2)(A), seeking judicial review over the administrative determination made by

Defendant United States Army Corps of Engineers ("USACE") or ("Corps") to issue a

permit to Defendant NEC Transit William, LLC ("NEC") allowing the filling of

approximately 7.54± acres of freshwater wetlands that constitute waters of the United

States regulated by §404 of the Clean Water Act, 33 USC §1344.  Annulment of the

permit is sought on several grounds, including USACE's failure to obtain a water quality certification from the State of New York under §401 of the CWA, 33 USC §1341, issuance of which is a condition precedent to USACE's award of a CWA §404 permit. Annulment is also sought upon the grounds that USACE's determination was arbitrary, capricious and contrary to lawful procedure in that it was made in contravention of legally-binding Guidelines for permit issuance promulgated by the United States Environmental Protection Agency ("USEPA") and USACE policies governing CWA §404 permit applications.

4.      Defendant NEC announced plans to develop certain real property approximately 36 acres in size primarily for "big box" retail development.  The proposed project site is situated on the northeast corner of Transit Road and William Street in the Town of Lancaster, County of Erie,  State of New York.

5.      This proposed development would entail the filling of virtually all the freshwater wetlands extant on the project site, which comprise an area of approximately 7.54 acres, and an intermittent stream that drains a substantial portion of the site.

6.      The Defendant United States Army Corps of Engineers has regulatory powers under 42 USC §1344 to issue permits for the discharge of dredged or fill material into waters of the United States, including certain wetlands.  This statutory provision was adopted as §404 of the Federal Water Pollution Control Act Amendments of 1972, also known as the "Clean Water Act."

7.      By way of a decision of the District Engineer of the Buffalo District of the United States Army Corps of Engineers dated January 6, 2003 the federal Defendants

determined that Defendant NEC's permit application met all criteria for permit issuance under §404 of the Clean Water Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 33 U.S.C. §1365(a) and 28 U.S.C. §1331.  This Court has jurisdiction over the subject matter of this action pursuant to §309(b) of the Act, 33 U.S.C. §1319(b), 28 U.S.C. §§1331, 1345, 1355 and 5 USC §706(2)(a).

9.      Venue is proper in this District pursuant to §309(b) of the Act, 33 U.S.C. §1319(b), and 28 U.S.C. §§1391 and 1395, because a) the non-federal Defendants are located and conduct business in this District, b) the federal Defendants' determinations over which judicial review is sought pertain to determinations made within this District and respecting real property situated within this District, and because this District is the location of the Clean Water Act violations alleged in this Complaint.

10.     On or about August 31, 2000 and November 18, 2002, ten of the Plaintiffs gave notice of the violations specified in this Complaint and of their intent to file suit to the Administrator of the U.S. Environmental Protection Agency (EPA), to the Regional Administrator of the EPA, to the New York State Department of Environmental Conservation ("NYSDEC"), and to the Defendants, as required by §505(b)(1)(A) of the Act, 33 U.S.C. §1365(b)(1)(A).

11.     More than sixty days have passed since notice was served, and the violations complained of in the notice are continuing at this time or are likely to continue. Neither the EPA nor NYSDEC has commenced or is diligently prosecuting a civil or criminal action to redress the continuous and ongoing violations.

12.     Defendants remain in violation of the Act.

13.     Venue is appropriate in the Western District of New York pursuant to §505(c)(1) of the Act, 33 U.S.C. §1365(c)(1), because the source of the violations is located within the District.

14.     This Court has original jurisdiction over this Complaint under 28 USC §1331 (federal question), 5 USC §§701-706 (Administrative Procedure Act) and 33 USC §1365(e) (FWCPA's saving clause, see *NRDC v. Callaway*, 524 F.2d 79 (2d Cir. 1975)).

15.     Venue is proper in the United States District Court for the Western District of New York pursuant to 28 USC §1391.

## PARTIES

16.     The Defendant United States Army Corps of Engineers (hereafter "Corps") is the federal agency having primary responsibility for implementing the permit requirement established under 33 USC §1344, and it is the agency which rendered the determinations which are a subject of this action.

17.     Defendant NEC Transit William, LLC (hereafter "NEC") is, upon information and belief, a domestic corporation which was the Applicant for a CWA §404 permit, and is the past and prospective developer of the site in question, and as such, is a "person" as defined in §502(5) of the Act, 33 U.S.C. §1362(5) and 40 C.F.R. §122.2.

18.     Defendant Bella Vista Group, Inc. (hereafter "BVG") is, upon information and belief, a domestic business corporation, and, has acted in concert with, and as agent and representative of Defendant NEC in prior administrative proceedings including those in issue in this litigation and as such, is a "person" as defined in section 502(5) of the Act, 33 U.S.C. § 1362(5) and 40 C.F.R. § 122.2.

19.     Defendant Opco, Inc. (hereafter "Opco") is, upon information and belief, a domestic corporation, with a principal office situated at the offices of Defendant BVG. Opco is an owner of premises constituting part of the site in question upon which violations alleged in Plaintiffs' First and Second Claims for Relief have occurred, and as such, is a "person" as defined in section 502(5) of the Act, 33 U.S.C. § 1362(5) and 40 C.F.R. § 122.2.

20.     Upon information and belief, Opco, Inc. is under contract with Defendants John & Carolyn Martzolf to purchase the eastern half of the premises which are the subject of this suit.

21.     Defendants John & Carolyn Martzolf (hereafter "Martzolfs") are the owners of the eastern half of the premises which are the subject of this suit, upon which is situated the large majority of the freshwater wetlands constituting waters of the United States for which a CWA §404 (33 USC §1344) fill permit was issued, the legality of which is at issue in Plaintiffs' Third, Fourth, Fifth and Sixth Claims for Relief set forth below.  The Martzolfs are each a "person" as defined in §502(5) of the Act, 33 U.S.C. §1362(5) and 40 C.F.R. §122.2.

22.     Plaintiff Citizens Against Retail Sprawl ("CARS") is an unincorporated association whose members consist primarily of residents whose real property is situated in the immediate vicinity of the property which the NFDs  seek to develop for Wal-Mart-style "big box" commercial use.

23.     It is now widely known and accepted that stormwater runoff from development is a major contributor to this nation's surface water quality problems. Stormwater contamination is varied.

24.     In a project such as the proposed Wal Mart development, stormwater contamination may be expected to consist of pesticides and herbicides from vegetated areas, heavy metals from, for example, brake dust settling on the proposed vast expanses of paved surfaces, and oil and grease from the wide array of motor vehicles that would utilize the site.

25.     Historically, stormwater management was perceived as only a flood control issue.  However, that has changed.

26.     In 1992, the New York State Department of Environmental Conservation prepared a publication oriented to local government officials, entitled "Reducing the Impacts of Stormwater Runoff from New Development."  The text of this publication is available on NYSDEC's internet website, at:

    http://www.dec.state.ny.us/website/dow/toolbox/index.html

The publication includes a preface for "local officials," signed by the Commissioner of Environmental Conservation, which emphasizes the need for local governments to broaden their stormwater management planning and review process to address water quality management.  The Commissioner stated:

> The traditional approach of stormwater management has been to get stormwater off-site as quickly as possible through the installation of drainage systems that steer excess water to the nearest ditch, stream, river, wetland or lake, which simply transfers drainage problems from one location to another. *Decades of dealing with stormwater runoff in this manner have had a major impact on water resources throughout New York State.*  Water quality degradation and an increase in downstream flooding are the inevitable results of the traditional approach to handling stormwater.

*Reducing the Impacts of Stormwater Runoff From New Development, ibid.* at p. iii.

27.     The magnitude of the water pollution facet of stormwater management is

great:

> While the need to manage stormwater runoff for flood prevention
> purposes  has long been acknowledged, pollution problems
> associated with stormwater runoff have been less widely
> recognized.  In urban areas, paved and roof surfaces collect
> pollutants which then are rapidly washed into drains and
> surface waters during storms rather than first being treated
> by vegetative cover and soil.  The Environmental Protection
> Agency has calculated that runoff from the first hour of a
> moderate-to-heavy storm in a typical U.S. city will contribute
> more polllutional load than would the city's untreated sanitary
> sewage during the same period of time.  Studies in New York State
> conducted as part of the Nationwide Urban Runoff Problem (NURP)
> have confirmed that contaminants contained in urban and
> suburban runoff such as sediments, phosphorus, nitrates, coliform
> bacteria as well as lead and other heavy metals can impair
> water quality in streams, lakes, wetlands and estuaries.

*Ibid.* at p. 5.

28.     Table 3 on page 19 of the same publication tabulates the proven

differential between contaminant loads from street surface runoff and raw sanitary

sewage.  Of 12 major categories of water pollution, street surface runoff's contaminant

loads exceeds the contaminant of raw sanitary sewage in 11 categories.  Lead discharges

from street surface runoff exceeds that of raw sanitary sewage by a factor of 1,800, and,

for six other categories, stormwater runoffs discharges exceed those of sanitary sewage

by factors measured in hundreds-fold.

29.     Defendants have caused and allowed pollution of waters of the United

States that are situated upon and that drain the project site.  These contaminants migrate

into the tributaries that drain the site.  These tributaries, in turn, drain into Cayuga Creek,

which is tributary to the Buffalo River, which empties into Lake Erie, which, in turn,

empties into the Niagara River.

30.     The aforesaid pollution includes sediments and chemicals that impair the quality of the aforesaid tributaries and receiving waters and reduce the ability of such waters of the United States to sustain and propagate healthy fish.

31.     Furthermore, the introduction of sediment and chemicals into the aforesaid waters of the United States causes degradation of the public water supply which is obtained from Lake Erie and the Niagara River, which serves the greater part of Western New York's population, including Plaintiffs.

32.     Sedimentation and the other contamination which Defendants have caused contribute to the costs of processing raw water for public consumption.  Dissolved contaminants cannot be removed from the processing, and are thus consumed by the public.

33.     Plaintiffs' domestic water supply is obtained from the Erie County Water Authority, which draws water directly from Lake Erie.  Plaintiffs also travel about Western New York, drinking water obtained from other public water supplies drawn from Lake Erie and the Niagara River.  These intakes are downstream from the mouth of the Buffalo River.

34.     Many of the Plaintiffs frequently hike and walk alongside and on the project site.  Most of the project site remains undeveloped at present, and sustains a wide variety of animal life.  Some of Plaintiffs are avid outdooorsmen and hunters who appreciate observing the diversity and relative abundance of certain game birds and other species on the project site.  The preservation of streams and adjacent wetlands promotes sustaining this valuable wildlife population.  Destruction of wetland habitat harms the

diversity and abundance of this wildlife, and impairs Plaintiffs' aesthetic enjoyment of same.

35.     Plaintiff George Ciancio, at the times relevant hereto, resided at 64 Northwood Drive in the Town of Lancaster, adjacent to the premises which are the subject of this suit.  He now resides in the Town of Grand Island and regularly visits the Northwood townhouse development located on Northwood Drive in the Town of Lancaster.

36.     Plaintiffs George C. Franke resides at 159 Northwood Drive in the Town of Lancaster, and would be adversely affected by the pollution and noise arising from the additional traffic that would arise from the proposed development of the subject property.

37.     Plaintiffs Sharon Cramer and Leslie Morris, husband and wife, reside at 54 Northwood Drive in the Town of Lancaster, and would be adversely affected by the proposed development for reasons including air and noise pollution and the displacement of the wildlife who currently reside on the subject property.

38.     Plaintiff Lawrence F. Helminiak resides at 52 Northwood Drive in the Town of Lancaster:  when he purchased his townhouse approximately 10 years ago, he did so in reliance upon the fact that the adjoining property was zoned for residential purposes.

39.     Plaintiffs David and Mary Alys Kratzke reside at 14 Northwood Drive in the Town of Lancaster.  They would be adversely affected by the proposed development, because they would be exposed to the rear of the shopping center where delivery trucks, garbage dumpsters and air conditioning units that constitute a nuisance and also devalue their residence.

40. Plaintiffs Brian and Helen Borzynski reside at 24 Northwood Drive in the Town of Lancaster. They have standing due to their immediate proximity to the subject property, and would be adversely affected by the developer's proposal to fill in all the wetlands existing on the subject property and to, directly and indirectly, destroy all of the existing trees on that property.

41. Plaintiffs Lucille and Denis Marsh reside at 155 Northwood Drive in the Town of Lancaster. They would be adversely affected by the development because of the resulting shopping center's noise and air pollution, including that from idling trucks. The Marshes oppose the development because government officials have repeatedly tried to rush it through without consideration of the effect increased traffic from the intense commercial development proposed for the site would have on the already congested local roads, and because it would change the quality of life for area residents because of the incompatibility with adjoining residential development.

42. Plaintiff Carolyn L. Baker resides at 58 Northwood Drive in the Town of Lancaster. She purchased her townhouse to retire in a quiet, safe community. The development would constitute a severe health hazard for her, the car and diesel truck fumes, much of which would emanate from loading areas a short distance away from her residence, would exacerbate her acute asthma. The proposed "big box" development is incompatible with the nearby residences.

43. Plaintiff Mary Cich resides at 30 Northwood Drive in the Town of Lancaster, and opposes the proposed intensive commercial development because it would create air and noise pollution and increase traffic to unacceptable levels.

44.     Plaintiff Robert Jay Smaczniak resides at 1164 Penora Street, in the Town of Lancaster, several blocks from the subject property.  His ability to use and enjoy his real property would be affected by increased noise, exhaust fumes and traffic, much of which would travel on Penora Street.

45.     Plaintiff Jerome J. Kucharski resides at 31 Northwood Drive in the Town of Lancaster.  He would be adversely affected by the proposed commercial development because of traffic and drainage problems.  The proposed development would fill in wetlands and change existing drainage patterns, affecting Northwood residents.  The proximity of the intensive commercial development to his residence would result in noise and air pollution.  Furthermore, the inclusion of a supermarket and/or restaurants would likely cause problems with rodents.

46.     Plaintiffs Jerry and Ida Sawyer reside at 26 Northwood Drive in the Town of Lancaster.  Their living quarters (living room, dining room, family room and bedroom) face the subject property which is proposed to be intensively developed.  These Plaintiffs will be subjected to polluted air from the emissions of the automobiles occupying the 1400-space parking lot and diesel fumes from the delivery trucks.  In addition, noise pollution, traffic congestion and the filling in of wetlands, all of which would result from the proposed development, require completion of environmental studies.

47.     Plaintiff Nancy Pieniazek resides at 8 Northwood Drive in the Town of Lancaster.  According to the developer's proposal, the "big box" that would be erected on the subject property would be only 105 feet from her backyard.  Year round, the noise and vibration from tractor trailers and snowplows servicing the business(es) would be unacceptable.  In addition, adverse effects include traffic congestion, light pollution, air

pollution and major changes in drainage.  She is concerned that the filling in of the wetlands on the subject property would block drainage from the Northwood Drive townhouse development and harm those properties.

48.     Plaintiffs Terrence & Kathleen Richard reside at 105 Northwood Drive in the Town of Lancaster.  Their home is adjacent to the proposed development, and would be affected by the increased noise pollution, exhaust and bright lights associated with commercial development.  Their greatest concern is traffic congestion.

49.     Plaintiff James P. Heisler resides at 81 Northwood Drive in the Town of Lancaster, a short distance away from the proposed development.  The traffic the development would attract to local streets, including Transit Road, William Street and Transit Boulevard would have the effect of sealing in the Northwood Drive townhouse development.  In addition, the proposed site plan overdevelops the site, minimizing buffer areas and maximizing paving, building size and wetland filling.

50.     Plaintiff Ronald J. Szypajlo resides at 6 Eastwood Parkway, in the Town of Lancaster, diagonally across William Street from the proposed development.  He would be adversely affected from the traffic congestion from the proposed development, and is concerned about his ability to make left hand turns from the Eastwood townhouse development onto William Street.

51.     Plaintiffs Stephen and Lucille Stawicki reside at 140 Northwood Drive in the Town of Lancaster.  Under existing conditions, exiting Northwood Drive is difficult during afternoon rush hour traffic, e.g., at 4:00 p.m.  The proposed development would significantly increase traffic on William Street, at the Northwood Drive intersection, and William Street is too narrow and heavily trafficked to accommodate this increased traffic.

52.     Plaintiffs Ruth and Norman Johnson reside at 142 Northwood Drive in the Town of Lancaster.  Existing traffic conditions on William Street are unacceptable under existing conditions at certain times of day, and the proposed development that would increase traffic.  In addition, the fumes from cars and trucks, in combination with the loss of the existing tree barrier on the Martzolf property, would exacerbate Mr. Johnson's asthma condition.

53.     Plaintiff Carleen Blake Ryan resides at 41 Northwood Drive in the Town of Lancaster.  Adverse effects resulting from the proposed intensive commercial development of the subject property include increased traffic volume, interference with existing drainage, loss of wetlands, noise from trucks, loading/unloading, HVAC (heating, ventilation and air conditioning) units, blowing litter, light spillage, and the unaesthetic view of a "big box" commercial structure.

54.     Plaintiffs Gary and Marieta Ronald reside at 33 Northwood Drive in the Town of Lancaster.  Despite the high real property tax rates in the Town of Lancaster, Plaintiffs chose to live there because of the high quality of life in their area.  The proposed development would negate the benefits of residing in the Town of Lancaster, through increased traffic and noise.  In addition, Plaintiffs observe these kinds of "big box" store developments frequently deteriorate over time, leaving empty or deteriorated buildings that constitute eyesores.

55.     Plaintiffs Walter and Virginia Wojdyla reside at 980 Borden Road in the Town of Lancaster, and would be adversely affected by the proposed development's increased traffic and noise.

56.     Plaintiffs Frank and Antoinette Volpe reside at 11 Sebring Drive in the Town of Lancaster.  They would be adversely affected by the proposed development's excessive traffic, increased noise and lighting pollution.

57.     Plaintiff Joy Thrun resides at 34 Northwood Drive in the Town of Lancaster.  Adverse effects from the proposed development include noise pollution, traffic congestion, decreased property values, and the increased potential for crime.

58.     Plaintiffs Frank and Marlene Todaro reside at 62 Northwood Drive in the Town of Lancaster.  The development associated with the proposed development would reduce the property values, cause noise pollution, traffic congestion, light pollution, loss of wetlands and the unsightly view.

59.     Plaintiffs Enrico and Domenica Benedetti reside at 35 Northwood Drive in the Town of Lancaster.  Mr. Benedetti is severely disabled by emphysema, the existing clean air will be polluted both during construction and, afterward, by heavy car and truck traffic on the nearby development site.  The Benedettis moved to the Northwood Drive neighborhood specifically for peace and quiet, which qualities would be lost with "big box" development.

60.     Plaintiffs allege that Defendants have caused and allowed pollution of waters of the United States that drain the project site.  These contaminants migrate into the tributary that drains the site, and will (if the construction sought to be enjoined goes forward) migrate into the NYSDOT storm sewer that captures the large majority of surface water runoff from the site and discharges into Cayuga Creek.  Cayuga Creek, in turn, is a tributary of the Buffalo River, parts of which are navigable in fact, and which discharges directly into Lake Erie, which is also navigable in fact.

61.     The aforesaid pollution includes organic waste, sediments and chemicals that impair the quality of the aforesaid tributaries and receiving waters and reduce the ability of such waters of the United States to sustain and propagate healthy fish.

62.     Furthermore, the introduction of organic wastes, sediments and chemicals into the aforesaid waters of the United States causes degradation of the public water supply which is obtained from Lake Erie and the Niagara River, which serves the greater part of Western New York's population, including Plaintiffs.  Sedimentation and the other contamination which Defendants have caused contribute to the costs of processing raw water for public consumption.  Dissolved contaminants cannot be removed from the processing, and are thus consumed by the public.    Plaintiff's domestic water supply is obtained from the Erie County Water Authority, which draws water directly from Lake Erie.  Plaintiff also travels about Western New York, drinking water obtained from other public water supplies drawn from Lake Erie and the Niagara River.  Some of these water supplies' intakes are downstream from the mouth of the Buffalo River.

63.     Many of the Plaintiffs frequently hike and walk through the site in question.  Approximately 30 acres of the site remain undeveloped at present, and sustain a wide variety of animal life.  Plaintiffs appreciate observing the diversity and relative abundance of certain birds and other animal species on the site.  The preservation of streams and adjacent wetlands promotes sustaining this valuable wildlife population.  Destruction of wetland habitat harms the diversity and abundance of this wildlife, and impairs Plaintiffs' aesthetic enjoyment of same.

## BACKGROUND FACTS

64.     The premises which are the subject of this suit are approximately 38 acres in area, and situated on the northeast corner of Transit Road and William Street in the Town of Lancaster, County of Erie and State of New York.

65.     Said premises contain 7.54 acres of freshwater wetlands constituting waters of the United States.

66.     Said premises are drained principally by an intermittent, unnamed stream which historically flowed through a culvert from east to west under Transit Road and which discharged into Slate Bottom Creek.

67.     Said Slate Bottom Creek is a tributary of Cayuga Creek, which is a tributary of the Buffalo River, which is a tributary of Lake Erie.

68.     Lake Erie is, both at present and historically, navigable-in-fact, and is extensively used for interstate, intrastate, and international commerce.

### Proceedings Before The United States Army Corps Of Engineers

69.     On or about March 15, 1999, Defendant NEC Transit William LLC ("NEC"), by Defendant Bella Vista Group, Inc. ("BVG"), applied to the Town of Lancaster to amend its zoning district map for the purpose of rezoning approximately 36 acres of land situated on the northeast corner of Transit Road and William Street to the "GB-General Business" zoning district classification, proposing that the premises, if rezoned, be used as a "commercial strip shopping center and [for] related operations."

70.     The preexisting zoning classifications of the premises were "CMS" ("commercial motor services") and R-1 (single family residential district).

71.     Approximately 21.2 acres of the site was zoned R-1.  This R-1 zoned premises is the property that was then – and is now – owned by Defendants John and Carolyn Martzolf.

72.     The requested rezoning is a discretionary decision of the Town Board, acting in its legislative capacity, and constitutes an "action" under the New York State Environmental Quality Review Act ("SEQRA"), codified as Article 8 of the New York State Environmental Conservation Law.

73.     SEQRA requires that all state and local agencies differentiate between Type II actions (requiring no environmental review) and other actions, which are designated either "Type I" actions or "Unlisted" actions.

74.     The former (Type II) class of actions require no environmental review. The latter (Type I and Unlisted) classes of actions do require environmental review, generally involving an initial determination of environmental significance which takes the form of either a "negative" or a "positive" declaration.

75.     A negative declaration is a determination that the action, as proposed, will not have a significant effect on the environment.  A positive declaration is a determination that the action may have a significant effect on the environment, so that a detailed environmental impact statement ("EIS") must be prepared and other procedures culminating in a "statement of findings" be followed.

76.     Type I actions require "coordinated review" among involved government agencies, part of which entails the selection of a "lead agency" to supervise SEQRA review from the pool of involved agencies.

77.     The rezoning application was a Type I action under SEQRA.

78.     On or about May 3, 1999, the Town Board of the Town of Lancaster ("Town Board") declared its intention to act as lead agency under SEQRA, and afforded other involved agencies approximately 30 days to object to such designation.

79.     No objections to the Town Board acting as lead agency were received from other involved agencies, and the Town Board, at all times relevant hereto, has acted as lead agency under SEQRA.

80.     On or about July 19, 1999, the Town Board issued a "positive declaration" under SEQRA, determining that the proposed project may have a significant effect on the environment and therefore requiring preparation of an EIS.

81.     On or about July 19, 1999, the Defendant Bella Vista Group, Inc. ("BVG"), by its wetlands consultants, Earth Dimensions, Inc. ("EDI"), wrote to Defendant USACE by a cover letter stating, in part, that there was "enclosed [a] Joint Application For Permit (JAP) and associated application materials pursuant to [sic] the issuance of a Nationwide 26 Permit for the project," the project being a proposed retail commercial development on the premises in question.

82.     EDI's July 19, 1999 correspondence cited a 1994 federal wetlands delineation locating three "jurisdictional wetlands totaling 2.03 acres," EDI proposed compensatory wetland mitigation be performed at the Spring Marsh Consolidated Wetland Mitigation Project in the Town of Newstead, Erie County.

83.     Upon information and belief, EDI also forwarded the Joint Application For Permit, on behalf of BVG, to the New York State Department of Environmental Conservation ("NYSDEC"), requesting Clean Water Act §401 water quality certification for the project.

84.     The Joint Application For Permit recited in box 12, entitled "Project Description and Proposed Purpose," that:

> The proposed retail development project will necessitate
> the use of 2.03 acres of federal wetlands.

85.     On or about July 19, 1999, Defendant BVG amended its rezoning application to reduce the total area sought to be rezoned to general business from approximately 36 acres to 31.69 acres.

86.     On or about September 2, 1999, USACE notified BVG and EDI that the 1994 delineation was more than five years old, and therefore a redelineation would be necessary in order for USACE to act on the application.

87.     On or about September 18, 1999, EDI, on behalf of BVG, wrote to USACE and enclosed a revised freshwater wetlands delineation based on both its 1994 delineation and a site visit on September 10, 1999.

88.     The 1999 redelineation determined that there were approximately 2.18 acres of jurisdictional federal wetlands on the site.

89.     On or about November 5, 1999, USACE notified BVG that USACE would have to inspect the project site to verify the accuracy of the wetland boundaries as identified by EDI.

90.     On or about November 22, 1999, the Town Board notified various government agencies, including USACE, that the Town Board had accepted that a certain draft environmental impact statement, or DEIS, submitted by NEC for the rezoning application was "complete" and "adequate" for the purpose of public review, and that comments would be accepted.

91.     On or about December 15, 1999, USACE, by a Senior Biologist, inspected the project site for the purpose of verifying the EDI delineation showing 2.18 acres of federal wetland on the site.

92.     Based on this inspection, USACE determined that the revised wetland delineation map is not accurate, that the site contains more federal wetland than the 2.18 acres depicted, and that the site may also contain an intermittent tributary constituting waters of the United States.

93.     On or about December 16, 1999, USACE notified the Town Board of the determinations noted in the preceding paragraph, and further advising Town Board that BVG "has not submitted an application for permit," that "[p]rocessing of the permit application once it is received, will include a determination of compliance with the U.S. Environmental Protection Agency ("USEPA") 404 b(1) Guidelines," that "[p]racticable alternatives  which  must be addressed include alternate sites, reduced project size, alternate layouts, etc." and that:

> The alternatives analysis contained within the DEIS does not provide sufficient detail for use in my [USACE] review.

94.     On or about December 16, 1999, NYSDEC wrote to the Town Board stating, in part, that:

> Until this Department receives the necessary information on the wetland mitigation, i.e., location, amount, COE approval, etc., the previously submitted application for 401 Water Quality Certification will remain incomplete.

95.     On or about December 20, 1999, USACE, by biologist Bridgette E. Brown, wrote to BVG, informing it that Brown [is] unable to continue processing your [BVG's] request because additional information is required to complete my [Brown's]

21

evaluation, that additional information needed includes a new wetland delineation because a site investigation determined that the 1994/99 wetland delineation is not accurate and understates federal wetlands present on the site, that revised project plans are necessary, and that in the future an analysis of alternatives to the work proposed in order to comply with 40 CFR Part 230 would be necessary, and that the information is needed by January 20, 2000 to prevent the return of the application.

96.     On or about January 13, 2000, BVG forwarded to USACE a document entitled "Application for Freshwater Wetlands Permit for the Northeast Corner of Transit Road and William Street for the Town of Lancaster, Erie County, State of New York," referencing Department of the Army application No. 2000-00325(0).  The document states that as part of project development: "[a] detention facility will be developed to control stormwater run-off from a 100-yr storm frequency and provide for filtering the stormwater before it enters the existing drainage system."

97.     On or about February 10, 2000, USACE met with representatives of BVG and, *inter alia*, discussed off site alternatives analysis.

98.     BVG represented that the project entailed two "big-box" stores, one to be occupied by Wal-Mart and the other by Home Depot, that would entail developing the entire 36+/- acre parcel.

99.     USACE requested additional information detailing available property in the area (the area limit was set at half the distance to the next closest Wal-Mart) which would be able to accommodate the project.

100.     BVG, by William Szawranskyj, P.E., represented to USACE that there were no parcels meeting the USACE criteria.

101.    On or about March 24, 2000, Defendant NEC, by Nussbaumer & Clarke, Inc. (consulting engineers), submitted a document entitled "Wetland Delineation Report" concluding that "seven Federal jurisdictional wetland areas totaling 5.89± acres were delineated on the property."

102.    USACE inspected the wetland boundaries and they were amended to reflect actual site conditions, on which total jurisdictional wetlands were 7.54 acres.

103.    On or about June 1, 2000, USACE wrote BVG verifying federal wetland boundaries as delineated by Nussbaumer & Clarke as shown on the delineation map dated April 27, 2000, depicting 7.54 acres of jurisdictional wetlands, and reporting that the mapped wetland delineation would be accepted by USACE for a period of five years, i.e., through May 31, 2005.

104.    On or about August 9, 2000, the non-federal Defendants commenced site clearing, primarily consisting of the removal of trees.

105.    Upon information and belief, approximately 20 acres were affected by this activity, including tree removal, storing piles of logs, branches and tree chips, and areas disturbed by the passage of motorized vehicles including a large "Hydro Ax" vehicle that cuts and removes trees while leaving stumps and root systems intact.

106.    The owner of the premises upon which this site clearing activity occurred was John and Carolyn Martzolf.

107.    Plaintiffs, by their counsel, determined that neither John and Carolyn Martzolf nor Bella Vista Group, Inc. had filed the "notice of intent" necessary to invoke coverage under NYSDEC SPDES General Permit No. 93-06 (authorizing stormwater

discharges associated with construction activity on more than five acres) in the manner required by the permit and by law.

108.    Upon information and belief, neither the Martzolfs nor Bella Vista Group, Inc., at any time during the month of August, 2000, had obtained an individual NPDES permit from USEPA, or an individual SPDES permit from NYSDEC (under a state permit program approved by USEPA as complying with the minimum requirements of the Clean Water Act, including 33 USC §1342), under §402 of the Clean Water Act, 33 USC §1342, authorizing stormwater discharges into waters of the United States, including federal wetlands and intermittent streams constituting waters of the United States, associated with the aforesaid construction activities.

109.    On or about October 5, 2000, Defendants Bella Vista Group, Inc. and/or John and Carolyn Martzolf filed a Notice of Intent affording coverage under SPDES General Permit No. 93-06 authorizing stormwater discharges from construction activities.

110.    On or about September 13, 2000, NEC submitted a "Joint Application for Permit" to both NYSDEC and USACE, describing the project as "retail center development on 36± acre site that would result in the filling of 7.5± acres of federal wetlands."

111.    On or about September 29, 2000, BVG forwarded to USACE a copy of "the most current site plan" for the project, depicting a "proposed retail store" having a 132,626 gross square foot main building with 141,998 square feet total area when including a "TLE" ("tire and lube express") and seasonal garden center.  The site plan also included a rough sketch of a "future building area," and an approximately 3.35 acre location entitled "possible storm water detention area . . . size and configuration may

vary." The site plan also reports a "total over-all site area" of 36.89 acres, with 261,558 square foot total building area and parking for 1,335 cars.

112.    On or about September 29, 2000, USACE inspected the project site, observing ongoing logging and chipping operations associated with the tree removal that occurred in the months of August and/or September, 2000, and observing that the approximately 20 acre eastern half of the project site "is virtually barren."

113.    On or about October 3, 2000, NYSDEC informed NEC in writing that the proposed §404 application requires "individual [Clean Water Act] Section 401 Water Quality Certification" and that, "[a]t the present time, this application is incomplete pursuant to 6 NYCRR Part 621 – Uniform Procedures . . ."

114.    The aforesaid NYSDEC notice dated October 3, 2000 identified certain issues that need to be addressed before NYSDEC would continue to process NEC's application for CWA §401 water quality certification, among them a map identifying the location of the "proposed mitigation site" compensating for wetland loss at the Transit Road/William Street location, and confirmation that the mitigation site has undergone an environmental review pursuant to the "State Environmental Quality Review Act" ("SEQRA"), New York Environmental Conservation Law Article 8.

115.    The aforesaid NYSDEC notice dated October 3, 2000 also informed NEC of its obligations to obtain a State Pollution Discharge Elimination System ("SPDES") permit for stormwater discharges from the site.

116.    On or about December 4, 2000, NEC/BVG forwarded to USACE the former's "over-all site plan" superimposed by the wetland boundaries.  It depicts a first phase of development, associated with what is now known to be a proposed Wal Mart

discount department store, which, with associated parking, would impact approximately 2.5 acres of the site's 7.54± acres of jurisdictional wetlands.

117.    Approximately 5 acres of the site's jurisdictional wetlands would be filled by development of unspecified retail space, parking, and a detention basin.

118.    On December 22, 2000, NYSDEC notified NEC Transit William, LLC, again, the application as supplemented remained incomplete, and that supporting reasons include:

- That the applicant's off-site wetlands mitigation plan details were in the process of being developed, that NYSDEC lacked those details, and that NYSDEC needed confirmation that USACE accepted the mitigation plan at the off-site mitigation site.

- NYSOPRHP needed to review a Phase I B archeological reconnaissance survey on approximately 20 acres of the site.

119.    On or about December 29, 2000 Defendant USACE published a "Public Notice" for the purpose of complying with 33 CFR §325.

120.    Said Public Notice referenced the aforesaid Clean Water Act §404 permit application, describing the project as "construction of a retail center, known as The Gateway Centre."  The public notice stated that the applicant "proposes to impact 7.54 acres of wetland," the majority through grading and filling and the balance through "secondary impacts of segmentation and loss of hydrology," so that they "are expected to be lost."

121.    The Public Notice describes the proposed project as expected to be completed in two phases, however, with the entire site being graded and filled "during the initial phase."  The Public Notice differentiates between the two phases as follows:

Phase I consists of a 142,000 square foot retail store, associated

parking, gas station, restaurant, bank and installation of a 3.35 acre storm water detention basin.  Phase II consists of the construction of a 100,000 square foot retail store and associated parking.  The applicant has already removed all vegetation from the upland portion of the site.  To date, the wetland vegetation has not been removed.

122.    The Public Notice also stated that the NFDSs would leave an undeveloped strip between 50 and 75 feet wide between the eastern boundary of the site to act as a buffer between the adjacent residential community and to also install a 16 foot high sound barrier along the eastern boundary.

123.    The Public Notice also stated that to compensate for the permanent loss of 7.54 acres of wetland at the Transit/William site, the applicant is proposing mitigation in the form of preserving 10.5 acres of existing federal wetland and creating two acres of federal wetland on a 12.5 acre site located on Crabapple Lane in the Town of Cheektowaga, Erie County.

124.    Plaintiffs commented extensively.

125.    During the public comment period, USEPA responded with written comments that, in relevant part, stated:

> I have reviewed the public notice for this project. . .
> The public notice states that the applicant has indicated
> that avoidance and minimization of wetlands impact
> is not feasible.  Compensatory mitigation would consist
> of preservation of 10.5 acres of wetland and creation of
> 2 acres of wetland from upland on a 12.5-acre off-site
> location within the same watershed as project impacts. . . .
>
> Please be advised that we would object to issuance of a
> Department of the Army permit for this project, as
> proposed, due to inadequate compensatory mitigation.
> ***We also find that there is insufficient information
> to evaluate alternatives and minimization, and that
> the size of impacts warrants our detailed review of such.***

(Emphasis added).

126.    On or about January 9, 2001 the United States Fish and Wildlife Service

commented:

> We have received the Public Notice for the above-referenced
> project.  We have strong concerns regarding the potential
> impacts from this project and would like additional information
> on the project purpose, the proposed retailers that will be using
> this location, any alternative sites other than those mentioned
> in the PN, and specific measures which the applicant used to
> minimize and avoid wetlands.  In addition, the PN states that
> a majority of the wetlands are associated with drainage ways.
> Is there any additional information such as a wetland delineation
> report that will give a complete description of these areas?  We
> will respond in writing prior to the PN expiration date.  Thanks.

127.    On or about January 11, 2001, the Town of Cheektowaga, by Councilman

Thomas M. Johnson, Jr., informed USACE that the low land forest and all affected

Cayuga Creek floodplain portions of the proposed Crabapple Lane mitigation site had

already been committed by the owner to be transferred to the Town of Cheektowaga as

environmental mitigation relative to a residential subdivision construction project having

no connection to the NEC construction project at issue in this lawsuit.

128.    On or about January 16, 2001, Town of Cheektowaga Councilman Thomas

M. Johnson, Jr. notified USACE that the area of the Crabapple Lane floodplain/floodway

obligated to be conveyed to the Town of Cheektowaga was 12.556 acres, embracing

much (if not all) of the NEC construction project's proposed mitigation.

129.    On January 19, 2001, New York State Office of Parks, Recreation &

Historic Preservation ("NYSOPRHP") Director Ruth L. Pierpont commented to USACE

that NYSOPRHP is the "State Historic Preservation Officer" ("SHPO") with which

USACE must consult under the "protection of historic and cultural properties" regulations

codified at 36 CFR Part 800, and that additional information is needed in order for SHPO to discharge its responsibilities.

130.   On or about January 22, 2001, William R. Pugh, P.E., Cheektowaga Town Engineer, wrote to USACE and informed it that the wetland preservation "mitigation" proposed by NEC included some, if not all, of a parcel 12.556 acres in size which another developer had committed to convey to the Town of Cheektowaga as mitigation associated with that developer's housing subdivision proposal.

131.   On January 25, 2001, the United States Fish & Wildlife Service ("USFWS") commented to USACE, stating:

> The service recommends that the District Engineer deny a permit for the proposed project due to the inadequate alternatives analysis, substantial impacts to aquatic resources, and the lack of adequate compensatory mitigation.   It is our recommendation that the Corps require the applicant to conduct a more rigorous alternatives analysis.  ***If the applicant can adequately demonstrate that no other suitable sites exist, then on-site avoidance and minimization measures must be further considered to reduce wetland impacts.***  In addition, the applicant must propose adequate compensatory mitigation for any unavoidable wetland losses.

(Emphasis added).

132.   On or about January 26, 2001 Plaintiff's counsel David J. Seeger, Esq. submitted comments to USACE.

133.   The first main comment Plaintiffs' counsel made was that: "The Applicant Has Failed To Demonstrate That There Are No Practicable Alternatives" To The Proposed Project.

134.   In support of that conclusion, Plaintiffs' counsel stated, *inter alia*:

> The applicant fails to reveal the actual uses to which its site

would be put.  Rather, it classifies its two "big box" stores as being merely "retail" without further specificity.

Simply stated, the application is devoid of any meaningful effort to consider alternative sites and to demonstrate through competent "dollars and cents" evidence (such as appraisals by qualified appraisers) that alternative sites cannot be utilized with reduced, or no, effects on freshwater wetlands.  Furthermore, the applicant fails to substantiate its claim that "site development and roadway improvements" under requirements dictated by the Town, County and State are so onerous that reducing project size would be financially impossible" because of inability to obtain "lease dollars [necessary] to cover the cost of the improvements." The applicant has sloughed off its heavy burden to clearly demonstrate that no practicable alternatives to the proposed wetland fills exist.

For a fill permit application (such as this one) which does not concern a water-dependent project, the Corps must assume that practicable alternatives exist unless the applicant clearly demonstrates otherwise, and this presumption "is *very* strong." *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir., 1982), cert. denied 461 U.S. 927 (1983) (emphasis in original).  The regulations are drafted in order to create "an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site."  *Bersani v. Robichaud*, 850 F.2d 36, 44 (2d Cir., 1988), cert. denied 489 U.S. 1089 (1989).

135.   Other contentions raised by Plaintiffs' counsel were:

- The need for a supplemental or revised public notice (and public comment period), under 33 CFR §325.2(a)(2), in the event that the substance of the application were to be changed, so that the public would have a meaningful opportunity to respond, and

- That under 33 CFR §327.4 a public hearing should be held, to address the following issues:

  o whether the applicant has clearly demonstrated that there are no practicable alternatives to destroying all of the affected 7.54± acres of freshwater wetlands

  o whether there are sites approximately 15 acres iin size (sufficient to accommodate applicant's Phase I) or 30 acres in size (sufficient to accommodate both applicant's Phase I and Phase II on land that is or reasonably could be zoned for commercial purposes within, say,

a three mile radius within the Towns of Lancaster and
Cheektowaga

o whether there is merit to applicant's representation that its proposal
to preserve wetlands within the Cayuga Creek floodplain near
Crabapple Lane constitutes bona fide mitigation and furthers a "no
net loss of wetlands" policy

o whether the applicant's proposed site plan will adversely effect
water quality or will unreasonably increase stormwater discharges

o whether the proposed activity would involve property eligible for
listing in the National Register of Historic Places

o whether the applicant has demonstrated that there are no
practicable alternatives to the proposed project

136.    In addition, comments dated January 28, 2001 comments from Drake
Environmental Consultants were submitted on behalf of Plaintiffs on wetlands and
ecology issues, concluding that on-site inspection and review of aerial photography
confirms that the wetlands proposed to be filled were part of a large complex extending
both on-site and off-site, much greater in size than what the applicant had disclosed to
USACE, and that the mitigation descriptions are highly inconsistent and appear plainly
insufficient for the value of the wetlands to be removed.

137.    On or about January 29, 2001, USEPA Region II, by Acting Regional
Administrator William J. Muszynski, commented on the proposed application, and
criticized "its practicable alternatives" analysis, and "recommend[ed] denial of the permit
as currently proposed."

138.    On March 15, 2001, NYSDEC confirmed to USACE and other local
government officials that the Town of Cheektowaga had received a deed from Rushford
Hollow, LLC of the approximately 12 acre "mitigation site" which NEC had proposed to
preserve.

31

139.    Thus, the proposed Crabapple Lane mitigation site 1) was not under NEC's site control, so as to allow NEC to ensure its preservation, and 2) the Town of Cheektowaga had, in accordance with pre-existing commitments of a developer, secured site control ensuring that the property would be preserved for reasons entirely unconnected to NEC securing a CWA §404 permit from USACE.

140.    On or about May 4, 2001, NEC's consulting engineers, URS, forwarded to Bridgette Brown of USACE draft correspondence withdrawing its pre-existing application, in order to provide the time necessary to respond to the January 30, 2001 USACE request for information.

141.    On May 7, 2001, URS Corporation, NEC's consulting engineers, formally notified USACE that it was requesting "a temporary withdrawal of the application referenced above [i.e., USA COE Application No. 2000-00325(2)]" to allow additional time needed to respond to USACE's January 30, 2001 request for information.

142.    On or about August 17, 2001, NEC's consultants submitted a "Joint Application for Permit" relative to the project site.  The Joint Application for Permit was submitted to USACE (seeking a permit under §404 of the Clean Water Act) and to NYSDEC seeking Clean Water Act §401 water quality certification.

143.    The Joint Application for Permit was filed with USACE on August 20, 2001.

144.    The August 16, 2001 report accompanying the August 17, 2001 Joint Application for Permit included the following:

- It acknowledged the existence of 7.54± acres of jurisdictional wetlands, all of which would be impacted by a proposed retail center construction project.

- It stated that the planned shopping center will be anchored by two major tenants with retail space totaling 142,129 sq. ft. and 130,000 sq. ft., respectively, in addition to several freestanding buildings on outparcels fronting on Transit Road.

- It stated that "[t]he purpose of the proposed development [] is to provide retail space for *two major national retail tenants new to the Lancaster area* . . ."

- The applicant proposed mitigation for the aforesaid 7.54± acres of federal wetlands by creating constructing new wetlands, 9.54 acres in size, some on a 6.41 acre site referred to as the "northern mitigation parcel" to the immediate north of the project site, and some on a 12.74 acre site elsewhere in the Town of Lancaster, referred to as the "Steinfeldt mitigation parcel," as well as preserving the balance of the two mitigation parcels that would not remain wetland.

145.    The August 17, 2001 application also included an analysis of four off-site alternative locations, which were:

- 1)  Benderson Development-Kulback Construction Property

- 2)  Vacant land north of proposed development site

- 3)  Southwest corner of Transit Road and William Street property

- 4)  "Flix" parcel on southeast corner of Transit Road and William

146.    The first alternative site is significantly smaller than the approved project site on the northeast corner of Transit Road and William Street.  It is also underlain by extensive federal wetlands.

147.    Therefore, the first alternative site is obviously unsuitable and not comparable.

148.    The second alternative site is an assemblage of numerous parcels to the north of the approved project site, underlain by an extensive complex of federal wetlands (of which the wetlands on the project site are a part).

149.    The third alternative site is approximately 13 acres in size and located on the southwest corner of Transit Road and William Street/Losson Road.

150.    Being only 13 acres in size, it is not comparable to the approved project site, and is plainly unsuitable for developing 300,000 square feet of retail space, since the buildings alone would consume more than half the site and leave far less room for parking than what any tenant would accept, as well as leave little or no room for landscaping, drainage control and engineered traffic features such as driveways, queueing space, etc.

151.    The fourth alternative considered by the applicant is located on the southeast corner of Transit Road and William Street, and has only approximately 8 acres of developable land.

152.    The fourth alternative site is plainly not comparable to the approved project site, being less than 25% of its size.  The proposed buildings would consume all of the fourth alternative site, leaving no room whatever for parking, landscaping, etc.

153.    The application also purported to address "on-site alternatives."  One of them is the "no-build alternative," which the applicant rejected on the grounds that it had incurred $5.4 million project costs to date, of which $4.5 million was for "land acquisition."

154.    The application stated:

> As shown in the calculations, there is a $5.4 million investment in the project to date.  Although the land could conceivably be re-sold should the project not proceed, it would be at extremely reduced rates resulting in a multimillion dollar loss.  For these reasons, the no-build alternative is not an option for the applicant.

155.    Upon information and belief, the applicant's representation that it had incurred $5.4 million investment in the project to date, of which $4.5 million was for land acquisition, is false, and the true figure is several million dollars less.

156.    Also, upon information and belief, the applicant did not expend significant sums for land acquisition until after it had proposed its project and was aware that it would need a permit from the United States Army Corps of Engineers under §404 of the Clean Water Act.

157.    The applicant also considered "downsizing" the project to include only one anchor tenant, rather than two, which would reduce the size of the wetland impacts to approximately 3 acres, assuming that the remaining store were placed in the southern portion of the project site.

158.    The applicant discounted this, stating that it would result in losses of approximately $2.8 million, calculating its excess costs as follows:

Investment undeveloped portion of Land Parcel………….  $2,000,000
Annual taxes on vacant ½ of Parcel (Post-development
    of other ½)…………………………………………  $   60,000
Cost of construction lost (needed for either 1 or 2
    stores, but allocated for 2nd)………………………  $  750,000
Insurance on undeveloped portion of project……………...  $   15,000
Maintenance on undeveloped portion of project…………..  $    6,000

159.    The applicant stated, in substance, that if burdened with these excess costs, "it would not be possible for the developers to recoup their initial investment," and, therefore, that "downsizing the project is not an option for the applicant."

160.    Upon information and belief, all, or at least most, of the alleged $2 million cost to purchase what applicant calls the "undeveloped portion of land was for real property that the applicant did not own and, for that matter, still does not own, and is not

under binding contract to purchase and, more important, has never been under binding contract to purchase.

161.    Therefore, the alleged $2 million investment is a sham, together with the calculation as to annual taxes, insurance and maintenance on it.

162.    Furthermore, other than a bald assertion, the applicant has utterly failed to demonstrate that it would incur $750,000 of fixed costs for Phase I improvements needed to be paid for by lease revenue earned from a Phase II big box retail store, in order for the project to be viable.

163.    Upon information and belief, Defendants Martzolf own a parcel over 20 acres in size comprising a majority of the project site.

164.    Upon information and belief, one or more of the developer Defendants has obtained options to purchase the Martzolf property, while has never entered into a binding contract to purchase said real property.

165.    The August 17, 2001 application proposed, in return for filling 7.54± acres of federal wetland on the project site, to mitigate, in part, by integrating site-generated stormwater into artificial wetlands it proposed to create, and existing wetlands, both on the "northern parcel" to the immediate north of the project site.

166.    The August 17, 2001 application confirmed this is the case:

> The creation component is composed of a wetland mitigation area which will be designed for 6" maximum inundation. ***Stormwater from the proposed Gateway Centre will enter the Detention pond which will outlet into the wetland creation area.*** The mature upland forest in the center of the site will remain an undisturbed forested upland island, once the mitigation area is connected with the existing wetland.
>
> Hydrologic inputs for the proposed mitigation area include precipitation and surface runoff from surrounding development.

> Surface runoff will initially enter the detention pond
> associated with the development.  The pond will outlet into
> the mitigation creation area.  The mitigation area will be
> designed as a shallow depressional wetland with a maximum
> of 6" of inundation.  It is anticipated that the mitigation area
> will have a surface connection to the existing wetland in the
> north and west portion of the site.

(Emphasis added).

167.    On October 9, 2001 the New York State Department of Environmental Conservation ("NYSDEC"), Region 9, by Regional Permit Administrator Steven J. Doleski, wrote to Defendant NEC, acknowledged receipt of its revised application for water quality certification associated with filling 7.54 acres of federal wetlands, and advised Defendant NEC that the application "remains incomplete" pursuant to NYSDEC's "Uniform Procedures" set forth in Title VI of the New York Code of Rules and Regulations.

168.    On October 12, 2001, the United States Department of the Interior, Fish & Wildlife Service ("USFWS") gave Defendant USACE its report of the USFWS and the Department of the Interior required and permitted by the Fish & Wildlife Coordination Act, 16 USC §§661 *et seq.*

169.    USFWS referred to its previous comments dated January 25, 2001, faulting the permit application for, *inter alia*, failing to adequately demonstrate the absence of practicable alternatives.

170.    USFWS then analyzed the current application, again faulting its "no practicable alternatives" analysis, stating in substance:

- The applicant has not identified the two proposed big box retail store tenants for the project, making it impossible to determine if their stated economic constraints are justified.

- The applicant states without data to support it that the 61 existing large retail stores within a 10 mile radius of the site, including supermarket and discount retailers such as Target, Wal Mart, Ames and K Mart, are not adequate to satisfy shoppers living more than 3 to 5 miles away.

- That the entire process for identifying, analyzing and selecting potential practicable alternatives must be based on project purpose and need, yet without specifying tenants for the two big box retail stores USACE will be unable to establish an appropriate scope of analysis for alternatives.

- The applicant has demonstrated a lack of effort to avoid and minimize wetland impacts on the existing site. Finally, that "project requirements (size, location) have been too narrowly defined and have therefore constrained the alternatives analysis" made by the applicant, and that the project may be implemented with one, rather than two, large anchor tenants, and possibly reduced out-parcel development.

171.    USFWS recommended that USACE deny the permit application due to inadequate alternatives analysis, failure to avoid and minimize impacts to aquatic resources, and due to the lack of adequate compensatory mitigation.

172.    On October 25, 2001, USACE wrote to Defendant Bella Vista Group, Inc. asking for a written response to the issues raised in the USFWS correspondence of Field Supervisor David Stilwell, dated October 12, 2001.

173.    On November 2, 2001, NEC, by its consulting engineers, submitted a response to the USFWS comments by letter authored by Mr. Thomas E. Butler.

174.    Notwithstanding that the October 12, 2001 comments of the United States Fish & Wildlife Service specifically faulted the applicant for failing to adequately address *off-site alternatives,* the NEC/Butler response failed and refused to address off-site alternatives, particularly alternative locations.

175.    In or about the month of October, 2001, Defendant NEC filed a document described as a "Supplemental Draft Environmental Impact Statement" ("SDEIS") on the project with the Town of Lancaster.

176.     The purpose of the SDEIS was to conform with the New York State

Environmental Quality Review Act ("SEQRA").

177.     Under SEQRA, a project applicant is obligated to disclose reasonably

foreseeable adverse environmental effects and to formulate mitigation measures that – if

impact avoidance is impracticable – minimize adverse effects to the maximum extent

practicable.

178.     The applicant acknowledged its plan to fill approximately 7.40 acres of the

known 7.54± acres of federal jurisdictional wetlands located on the project site, and

discussed proposed wetland mitigation measures.

179.     The SDEIS prefaced its discussion of mitigation measures by stating:

> The conceptual mitigation plan has been reviewed,
> and in principle has been agreed upon by the U.S.
> Army Corps of Engineers, who exercise jurisdiction
> over the impacted wetlands.

180.     The SDEIS made clear that virtually all of the stormwater runoff from the

site would be conveyed to a stormwater detention basin and undergo treatment enhancing

water quality through engineered features including two plunge pools, extended

detention, the creation of a "polishing pool" similar to a wetland environment in

sustaining plant species compatible to freshwater wetlands, and, ultimately, discharge to

existing wetlands and to a replacement wetland, both of which would provide further

water quality enhancement.

181.     Thus, the SDEIS stated:

> . . . due to the change of land cover to largely impervious
> state, all but a small portion of the storm water on site will
> be conveyed through the proposed storm water detention basin . . .
>
> The proposed detention basin will include two small plunge

pools and a polishing pool. . . . The basin will be designed to provide extended detention, which will enhance water quality by removing total suspended solids (TSS) and allowing particulates and associated pollutants to settle.  The basin will be graded so that water flows toward the polishing pool.

The polishing pool will be similar to a wetland environment in that it will sustain compatible plant species.  Wetlands provide water quality benefits by such mechanisms as trapping sediment, chemical adsorption and uptake, and microbial decomposition.

. . . Water from the polishing pool then will be directed by gravity flow to two regulated culverts.  A maximum of 20 cfs will be conveyed to existing wetlands located to the west of the basin.  This flow is to simulate existing conditions where 15 cfs from an offsite detention basin and a small portion of the runoff from the existing site currently flow to this wetland. the remainder of the flow will be conveyed to a proposed replacement wetland that will be located to the north of the proposed detention basin . . .

182.    On or about November 20, 2001, Plaintiffs' counsel forwarded the aforesaid DEIS passages to USACE.

183.    On or about November 21, 2001, NEC's consultants met with Bridget Brown of USACE, and advised her that the extent of existing freshwater wetlands on the "northern mitigation parcel" were larger than originally estimated, that the site was high quality upland/wetland forest, and that it was not suitable for wetland creation, including the artificial wetland which NEC had committed to create to receive and purify stormwater discharges from the project site.

184.    On or about December 5, 2001, counsel for Plaintiffs wrote to USACE and NYSDEC, enclosing a copy of a November 12, 2001 Drake Environmental Consultants report and, further, presenting comments on the USFWS October 12, 2001 comments and November 2, 2001 response of NEC's consultants.

185.   Among these comments were the following:

- ***The applicant asserts that under "Alternative IV", which would provide for only one anchor store to be built on the project site, it would lose an "[i]nvestment for undeveloped portion of the land parcel" in the amount of "$2,000,000".*** No attempt is made to substantiate this claim.  The wetlands are situated on the "Martzolf parcel," which is approximately 21 acres in size, presently zoned R-1 (single-family residential), and located at the rear of the property, that is, farthest away from Transit Road.  Until recently, and possibly at the present, the applicant did not own the Martzolf property and merely owned an option or some other kind of contingent right to purchase the property.  ***I do question the truthfulness of the applicant's claim that an alternative reducing the area of retail stores on the site would result in the applicant having spent $2,000,000 on land that would be left undeveloped.***

- Similarly, the applicant fails to substantiate its claim that "Alternative IV" would consign itself to "$750,000" of fixed construction costs that could be allocated to the second large retail building it would build under its preferred alternative. Significant reductions in the area of retail space means significant reductions in trip generation that, for example, would translate into large savings in the cost of mitigation measures. ***The applicant's claim that it would suffer $750,000 in fixed, stranded construction expense is without any foundation and should be rejected as unreliable and self-serving.***

- The USFWS comments assert that the applicant has failed to demonstrate that practicable alternatives including alternative sites do not exist.  ***The applicant's response makes no effort to inventory potential practicable alternative sites, and states only that Wal-Mart and another major tenant have "conducted marketing studies indicating the need for convenient shopping opportunities centralized in the Williams/Transit area."  This self-serving statement has no evidentiary value, and evades the real question of whether alternative locations in the Towns of Cheektowaga or Lancaster could be profitably developed for discount department stores and/or home improvement stores.***

- The applicant's November 2, 2001 response to the October 12, 2001 USFWS comments discusses four on-site alternatives. "Alternative I" packs so much development into the site that it would be simply impracticable from any perspective, including those of engineering, ecology and esthetics.  The applicant

concedes this. "Alternative I" is, simply put, valueless for the purpose of "practicable alternatives" analysis. Both "Alternative II" and "Alternative III" entail building square footage of approximately 300,000 square feet. The applicant claims it has made concessions in "Alternative III" when compared to "Alternative II," however, the very modest concessions incorporated into "Alternative III" could easily have been incorporated into "Alternative II."

- "Alternative IV" is wrongly discounted by the applicant based on conjured economic reasons which I have discredited above.

Emphasis supplied.

186.    On December 13, 2001, Ms. Bridget Brown of USACE met with

NYSDEC, NEC and Town of Lancaster representatives, and took notes of the meeting.

187.    The December 13, 2001 meeting notes stated, in relevant part:

. . .

2) The NYSDEC had several issues regarding the SEQR process and the Supplemental DEIS. The issues relevant to the USACE permit process are as follows:

a) The NYSDEC requested that the SDEIS be modified to clarify that the proposed mitigation area to the north of the project site is no longer proposed for wetlands creation only preservation due to the increased amount of wetland delineated on the parcel. . . .

3) I indicated that I needed a revised project drawing on 8.5 x 11 inch paper with the wetland boundaries overlain. I also indicated that I needed to perform a thorough review of the proposed mitigation, including verification of the wetland boundaries and a review of the quality and functions & values. I indicated that I had not yet received a detailed report from the applicant regarding these issues. The NYSDEC indicated that they would not be able to issue the individual water quality certification until the complete SEQR process is complete including the review of a completed SDEIS. I indicated that if my review was completed and I determined that a permit could be issued, however, the state process was not completed, I would issue a provisional permit. The NYSDEC requested that I contact them prior to issuing the

provisional permit to ensure all necessary issues had been covered and to check on the time frame for their permit issuance.

188. On January 9, 2002, NYSDEC, by Regional Permit Administrator Steven J. Doleski, wrote to Town, USFWS, USACE and NEC representatives, responding to a Town of Lancaster notice dated December 12, 2001 accepting as complete the aforesaid Supplemental Draft Environmental Impact Statement ("SDEIS") for the project.

189. The NYSDEC comments referenced the discrepancy between the contents of the SDEIS respecting wetland impacts and what was then most recently proposed as part of the project for mitigation purposes, and the suggestion made during the meeting that the SDEIS be updated to reflect those changes as currently proposed.

190. The January 9, 2002 NYSDEC comments also stated:

> Specifically, this Department identified the following inconsistencies, which we believe need to be addressed in the SDEIS:
>
> 1. According to the SDEIS, the northern mitigation parcel would consist of a combination "wetland creation, wetland preservation and mature upland forest preservation". Since it has subsequently been determined that a large portion of this site already consists of federal wetlands, it is now proposed that the northern mitigation site would only consist of preservation of the existing ecotypes, and not include wetland creation. ***This item should also be changed in the Joint Application for Permit to this Department and the COE.***

Emphasis added.

191. On or about February 8, 2002, NEC submitted a document entitled "Proposed Wetland Mitigation Plan for the Gateway Centre, Town of Lancaster, Erie County, New York," which represented NEC's intention to use the northern mitigation parcel for preservation purposes.

43

192.    The February 8, 2002 proposed wetland mitigation plan made no reference to altering the character or quantity of discharges from project development generally and wetlands filling in particular, when compared to that described in the original application and the SDEIS.

193.    On February 21, 2002, USACE met with NEC and Town representatives to discuss the application, at which meeting NEC proposed to include funding of restoration of 12 acres of wetland at the Tonawanda Wildlife Management Area in cooperation with Ducks Unlimited.

194.    At the February 21, 2002 meeting NEC represented that it would provide details regarding surrounding land use and the affected development adjacent to wetlands in the northern preservation area.

195.    On March 8, 2002, NEC submitted a proposed Final Environmental Impact Statement ("FEIS") pursuant to SEQRA to the Town of Lancaster, which was adopted by the Town on March 18, 2002.

196.    The FEIS stated, in response to comments received from the Town's consultants, Clough Harbour & Associates, as follows:

> **Comment 9**    *CH&A item 6.2.1:  Hydrology will be a critical component for created wetlands in the northern mitigation parcel.*
>
> **Response**      No wetlands will be created in the Northern Mitigation Site.  Wetland mitigation in this area will consist of high quality wetland and upland preservation and protection through a conservation easement.  Stormwater from the plaza will be directed along with a portion of stormwater from Northwood Village to a retention pond in the northeast corner of the NEC site.  The stormwater will be treated, managed, and released (limited to 36 c.f.s. discharge) to offsite wetlands and the western portion of a small area of Northern Mitigation Site wetlands.  Because

the stormwater will be managed and treated, water quality in these wetlands will not be significantly impacted.

197.   The FEIS also included a response to a similar, public comment:

> *Comment 4*   *The destruction of high-quality wetland for additional stormwater runoff detention does not meet the "No Net Loss" of wetlands.  The area to the north is not suitable for wetland mitigation.  Wetland construction would only destroy the already existing wetlands.*

> Response   No wetland creation is proposed for the Northern Mitigation Site.  None of the existing wetlands will be destroyed.  Current sources of wetland hydrology for existing off-site wetlands adjacent to the project will be maintained during and after project construction.  Stormwater released to the western portion of offsite and Northern Mitigation Site wetlands will be treated and managed so as to protect water quality.  A feature to create wetlands to overcompensate for the loss of wetlands is provided by the addition of a coordinated participation with Ducks Unlimited for wetland restoration and enhancement in the Tonawanda State Wildlife Management Area.

198.   On March 11, 2002, Plaintiffs' counsel forwarded to USACE a copy of portions of the FEIS, including the above-referenced comments and responses and others pertaining to wetlands impacts.

199.   On March 25, 2002, USACE forwarded the FEIS portions which Plaintiffs' counsel had furnished USACE to Mr. Mario Paula of USEPA, who was responsible for drafting USEPA's comments on the project under §404(?-q) of the Clean Water Act.

200.   On or about March 25, 2002, Mr. Paula of USEPA wrote via e-mail to Ms. Brown of USACE:

> I received your fax.  I am drafting a letter to the Corps that will remove our objections to the project, ***based on the information given.***

Since our initial letter was a "q", our Regional Administrator
has to sign this letter.  It should go [out] in about two weeks.

201.    On March 26, 2002, Ms. Brown of USACE telephoned NEC and informed

William Szawranskyj that USACE needed a plan showing the details of the proposed

stormwater basin, including inlet and outlet and a cross section of the outfall, and a plan

showing drainage information and discussion of it clearly showing that properties located

to the north and west of the project site that contain wetlands would continue to receive

the same water input from the site as current natural conditions provide.

202.    On or about April 2, 2002, Mr. Szawranskyj filed copies with USACE on

behalf of NEC of a "Topography Plan, Site Plan, Utility Plan and Grading and Storm

Sewer Plan."

203.    On April 5, 2002, Ms. Brown again spoke with Mr. Szawranskyj and

informed him that the project plans she received were missing the stormwater basin and

drainage information requested above.

204.    Ms. Brown also advised Szawranskyj that she required the wetland

boundaries superimposed on the project plans.

205.    On or about April 5, 2002, Mr. Szawranskyj forwarded to Ms. Brown

three copies of a document entitled "Site Plan", one of which had the wetland boundaries

superimposed upon it.

206.    On or about April 15, 2002, the Town Board of the Town of Lancaster, as

lead agency under SEQRA, adopted a "Findings Statement" concluding SEQRA review

and concluding that the project minimized adverse environmental effects to the maximum

extent practicable.

207.    The Findings Statement presented reasons in support of that

determination, including a discussion of "Drainage," which, in relevant part, stated:

> . . .
>
> The Applicant will provide a stormwater management
> system, which is designed to attenuate peak rates of
> stormwater flow from the Site equal to that of a 100-year
> post-development storm to flow no greater than 10-year
> pre-development storm to flow no greater than 10-year
> pre-development storm event.
>
> NYSDOT has indicated to the Applicant that
> pre-development peak discharge rate should be no
> greater than 36 c.f.s.  Applicant must comply with this
> prescribed threshold.
>
> The Applicant will follow best management practice for
> stormwater pollution prevention.
>
> The Applicant will finalize design and follow a Stormwater
> Pollution Prevention Plan, which will be utilized to allow
> the use of the State Pollution Discharge Elimination System
> (SPDES) permit from the NYSDEC.  The Applicant must
> file a Notice of Intent, Termination and Transfer and demonstrate
> conformance of the Stormwater Pollution Prevention Plan
> with the SPDES General Permit guidelines.
>
> The detailed storm drainage system for the Site must be
> Included in site plans for review by the Town Engineer,
> Town Planning Board and Town Board.
>
> . . .
>
> The design water levels for the stormwater management
> system will be set to preclude negative drainage conditions
> upstream of the basin area.
>
> The stormwater management and treatment system will be
> constructed to dissipate energy and prevent scouring at the
> basin inlets.  In addition, the system will provide extended
> detention for pollution removal, and discharge to an area
> in which natural processes will provide further polishing of
> the stormwater prior to release into the existing drainage
> network.

208.     Thus, for the first time, the Applicant represented its intention to discharge contaminated stormwater into a New York State Department of Transportation ("NYSDOT") storm sewer in quantities up to 36 c.f.s.

209.     The above-referenced storm sewer was installed by NYSDOT in conjunction with a recent Transit Road highway improvement project.

210.     Discharges to that storm sewer would flow a distance of approximately 6,000 feet and discharge directly into Cayuga Creek.

211.     Cayuga Creek is a perennial stream draining a watershed of, upon information and belief, several hundred square miles.

212.     Cayuga Creek discharges into the Buffalo River.

213.     The Buffalo River flows into Lake Erie which is navigable in fact and has historically been used in interstate and international trade and commerce.

214.     Upon information and belief, portions of the Buffalo River, including the reach between its confluence with Cayuga Creek and its mouth are navigable in fact and have historically been used for trade and commerce.

215.     Discharges from the aforesaid NYSDOT storm sewer into Cayuga Creek are unfiltered, untreated and otherwise unpurified.

216.     On April 17, 2002, USFWS, by Mr. Timothy Sullivan, submitted further comments to USACE.

217.     Recognizing that the first level of analysis in CWA §404 review should be whether impacts from filling are avoidable, Mr. Sullivan referenced the USFWS letters dated January 25, 2001 and October 15, 2001, and noted that USFWS had never been

provided with information to discount its assertion that practicable alternatives which would avoid impacts to the wetlands in question exist.

218.    Mr. Sullivan went on to critique the Applicant's proposed mitigation.  His main points were:

- The proposed project would involve the loss of 5.14 acres of forested wetland which should be replaced (if no practicable alternatives exist) with new forested wetland impacts, preferably at a ratio of 2:1.

- The Applicant proposed no forested wetland creation.

- That mitigation in the form of preserving nearby upland and wetland is generally unacceptable.

- That mitigation in the form of providing funds to Ducks Unlimited/NYSDEC for wetland restoration on a 12 acre site at the Tonawanda Management Area which is owned by the State of New York is inadequate because the area to be restored is already protected from development and is part of a managed area for wildlife.

219.    On or about April 25, 2002, USEPA Region 2 Regional Administrator Jane M. Kenney notified USACE that it considered the Applicant's revised alternatives analysis as adequately meeting Clean Water Act §404(b)(1) Guidelines and that the revised mitigation plan is adequate to compensate for unavoidable project impacts.

220.    On June 6, 2002, Ms. Bridget Brown of USACE spoke with one of NEC's consultant and advised him that the proposed detention basin does not show an outfall, that she had been previously assured by another one of the Applicant's consultants that the detention basin would outfall to the northern mitigation parcel, that the plans she had been provided do not show this to be true, and that she objected to secondary impacts on the off-site wetlands through increased or decreased water levels.

221.    By way of a memorandum dated July 18, 2002, Ms. Bridget Brown of USACE memorialized discussions held with Applicant's representatives at a July 17, 2002 meeting.

222.    Ms. Brown's memorandum included the following:

> I expressed concern over maintenance of existing drainage to off-site wetlands.  I indicated that the project plans do not show an out let from the proposed detention pond to the off-site wetland to the north as originally discussed. Don [Owens] indicated that they propose to keep the on-site stormwater separate and that they now propose to construct a drainage channel from the off-site detention area to the northern wetlands.  This will ensure that the off-site properties are not being flooded from site storm water.  The onsite detention basin will flow via closed pipe to the existing closed drainage system along Transit Road.  I requested detailed drawings.

223.    On August 14, 2002, Ms. Bridget Brown of USACE wrote via e-mail to the Applicant and its representatives and Mr. Charles "Chuck" Cranston of the NYSDEC Region 9 office, summarizing the outstanding issues, including the need to present plans depicting drainage, and further, with respect to Clean Water Act §401 water certification, stating:

> 4.401 Water Quality Certification.  I spoke with Chuck Cranston, NYSDEC regarding 401 WQC.  He indicated that they have not yet put the project on notice.  He was waiting until I have received all the necessary information to ensure they would not have to renotice.  He still has not been copied on additional information sent to USACE. Copies of all correspondence should be forwarded to NYSDEC.  I suggest that someone give him a call to make sure all [sic] there isn't any additional information that is needed by NYSDEC once these revised plans are submitted.
>
> Once all issues (1-3 above) are resolved, I will be ready to issue my permit.  However, NYSDEC will most likely not be ready to issue their permit.  Without 401

> WQC I can only issue a provisional permit.  Once 401
> is issued then the USACE permit validation process can
> begin.  If 401 WQC will only be delayed for a short
> period (couple of weeks) then typically I skip the
> provisional and wait for the 401 since it does not speed
> up the process.  You cannot begin work until the 401
> is issued and the USACE permit validation process is
> completed.

224.    On September 25, 2002, as Bridget Brown of USACE corresponded via

e-mail with Mr. Steven Doleski, Regional Permit Administrator, and Mr. Charles

Cranston, both of NYSDEC Region 9, stating:

> I checked our regulations regarding the waiver of
> the WQC.  **WQC is waived after 1 year from our
> public notice date.**  The only way this time frame is
> altered is if you are formally requested to stop review
> by Corps of applicant.  **Since we never requested you to
> stop your review, the time frame has expired.  I will
> send you a written letter when I receive SHPO clearance.**

225.    As alleged above, the proposed discharge from wetland filling impacts

was changed from adjacent wetlands on the northern parcel to Cayuga Creek (via the

NYSDOT storm sewer), however, the Applicant failed, neglected and refused to furnish

NYSDEC information respecting its project changes confirming and describing the

change in discharge.

226.    On or about October 22, 2002, NEC's consultant forwarded maps to

USACE, but not to NYSDEC, purporting to show the addition of swales routing off-site

storm water discharges into existing wetlands on the northern mitigation parcel

227.    On or about November 1, 2002, NEC's consultant forwarded to USACE,

but not to NYSDEC, revised copies of the proposed project's grading and drainage plan.

228.    On November 4, 2002, USACE wrote to Plaintiffs' counsel, summarizing

Plaintiffs' counsel's comments dated January 26, 2001 with respect to the original Public

Notice, and noting his request for a public hearing and concluding that "there would be no benefit to holding a public hearing" and that the request is denied, while inviting additional comments to be provided within 15 days.

229.    On November 6, 2002, USACE wrote to NYSDEC a letter memorializing USACE's position stated in the aforesaid September 25, 2002 communication, stating, in relevant part:

> In accordance with Title 33 of the Code of Federal Regulations Part 325.2(b)(1), "a Section 401 Water Quality Certification (WQC) waiver will be deemed to occur if the certifying agency fails or refuses to act on a request for certification within sixty days after receipt of such a request unless the district engineer determines a shorter or longer period is reasonable for the state to act . . . not to exceed one year" (See enclosure). ***A request for WQC for the proposed project was received by your office on December 29, 2000.  Project related impacts have not changed since the original request and more than one year has passed since your receipt of the request. Therefore, a waiver of the WQC is deemed to have occurred.***

Emphasis added.

230.    On November 6, 2002, USACE issued an "Environmental Assessment And Statement Of Findings For Department Of The Army Permit Application No. 2000-00325(3)," (hereafter "EA/SOF") in purported compliance with various federal regulations including those set forth in 33 CFR §§320 *et seq.*

231.    Key provisions of the EA/SOF respecting project need and the availability of practicable alternatives were:

- The project would be built in two phases.

- Phase One consists of an approximately 142,000 square foot Wal-Mart retail store with associated parking, a gas station, restaurant, bank and installation of a 3.35 acre stormwater detention basin.

- Phase Two would consist of construction of a 130,000 square foot retail store with associated parking, the store being for an unspecified national home improvement chain purportedly new to the area.

- All on-site wetlands totaling 7.54 acres would be impacted, virtually all by filling during Phase One.

- Alternative site locations considered were limited only to a section of Transit Road situated between the Village of Depew and French Road, four such alternative sites were evaluated, three of which were too small for the proposed project and the fourth of which – an 85 acre site of primarily vacant forest land – has an extensive wetlands complex.

- That the 130,000 square foot Phase Two tenant had a confidentiality agreement prohibiting disclosure of its identity and, further, had specified the 130,000 square foot and associated parking as the minimum it needed to operate a store.

- That reducing project size would reduce the area of impacted wetlands from 7.54 acres to approximately 3 acres and still accommodate building the Wal-Mart store, however, that the Applicant indicated this was not financially feasible since it would not be able to recoup the "initial investment" on the developed and undeveloped portions of the site.

- That the Applicant has calculated its investment in the project to date at $5,400,000.

232.   Key provisions of the EA/SOF respecting water quality are that:

- "no appreciable impacts to water quality are expected" and that "the proposed storm water detention basin will help filter out sediment before the water is discharged into Cayuga Creek."

233.   Notwithstanding this finding respecting water quality, the USACE record is devoid of any analysis that:

- Shows the design of the stormwater detention basin.

- Confirms whether the stormwater detention basin provides for extended detention, a "wet pond" or a retention basin.

- Includes customary and affordable engineered features that address the known pollution associated with stormwater, including removal of metals, oil and grease, suspended solids, bacteria, and temperature control.

- Utilizes well known objective formulae to quantify the pollutant load being discharged into Cayuga Creek, the compatibility of this pollutant load with Cayuga Creek water quality, and whether the Applicant has taken practicable measures to reduce impacts on water quality.

234.    Applicant did not disclose to NYSDEC or USEPA that its proposed discharges arising from wetland filling changed between its original proposal, on the one hand, and its final proposal which was approved by USACE.

235.    On November 13, 2002, NYSDEC Region 9 Regional Permit Administrator Steven J. Doleski wrote to USACE and others that Ms. Bridget Brown of USACE had concluded that the State had waived its right to issue a water quality certification since more than one year had elapsed since the December 29, 2000 date of USACE's Public Notice, and that NYSDEC agreed with that interpretation.

236.    On January 6, 2003, USACE wrote to NEC, stating that it has decided to authorize the work described in NEC's application, as amended, and forwarding an "unvalidated Department of the Army permit," and advising the Applicant that before it may proceed with the authorized work, it must complete the permit validation process.

237.    On January 22, 2003, USACE forwarded a validated Department of the Army permit to NEC.

238.    Special Condition 1 of the permit provides that NEC shall enter into a final agreement with Ducks Unlimited and transfer to Ducks Unlimited funds intended to finance Ducks Unlimited's wetland restoration efforts, and then submit within 60 days detailed final project plans of Ducks Unlimited, all as a precondition to filling any of the 7.54 acres of freshwater wetlands that the project would impact.

239.     To date, upon information and belief, NEC has not transferred funds to Ducks Unlimited to finance wetlands restoration, except for a modest initial payment intended to pay for the cost of design.

240.     Upon information and belief, detailed final project plans required under Special Condition 1 of USACE's §404 permit have not been submitted to USACE.

241.     Special Condition 2 of the §404 permit requires that NEC create 7.14 acres of wet meadow wetland at the "Steinfeldt Mitigation Area" and preserve in perpetuity the entire 13 acre Steinfeldt site through placement of deed restrictions and transfer to the Town of Lancaster.

242.     No part of the wetland creation work at the Steinfeldt site has commenced, nor has the Steinfeldt property been transferred to the Town of Lancaster, and nor have deed restrictions preserving it in perpetuity been imposed.

243.     Special Condition 3 requires that NEC preserve the 10.75 acres "northern mitigation area" in perpetuity through the placement of deed restrictions and the transfer of the property to the Town of Lancaster.

244.     However, placement of deed restrictions preserving the 10.75 acre northern mitigation area has not occurred, nor has the property been transferred to the Town of Lancaster.

245.     Upon information and belief, as of the date that this Complaint is filed, the approximately 21 acre Martzolf property upon which the large majority of the wetlands that would be impacted by the activities authorized by USACE's §404 permit has not been transferred to NEC, nor has payment for same been made.

**Corps Determines That The Site's Freshwater Wetlands
Are "Jurisdictional," i.e., Constitute "Waters Of
The United States" As Defined In 33 CFR §328.3**

246.    On or about April 3, 2001, USACE, by Paul G. Leuchner, Chief of the Regulatory Branch of the Buffalo District, informed Defendant Bella Vista Group, Inc. that, even in light of the United States Supreme Court decision of *Solid Waste Agency of Northern Cooke County v. U.S. Army Corps of Engineers*, _____ U.S. _____ (2001), the 7.54 acres of wetland delineated on NEC's project site ". . . are historically part of a tributary system to Lake Erie," are "**not** isolated," and "**are** subject to regulation under Section 404 of the Clean Water Act," and instructed that the developer "must obtain Department of the Army authorization to commence with work on the site."

247.    USACE informed the non-federal Defendants of its determination, and notified them of their right of administrative appeal.

248.    Defendant NEC thereafter, on or about June 1, 2001, appealed the aforesaid jurisdictional determination.

249.    On August 30, 2001, Rodney L. Woods, Regulatory Program Manager of the USACE Great Lakes & Ohio River Division, determined that Defendant NEC's appeal lacked merit and that the six delineated wetlands, together comprising 7.54± acres, meet the requirements for jurisdictional waters of the United States subject to regulation under §404 of the Clean Water Act.

**Non-Federal Defendants Lack Approvals
Necessary To Construct Upon Or Fill The
Freshwater Wetlands And Intermittent
Stream Which Is The Subject Of This Suit**

250.    The non-federal Defendants lack local approvals necessary to construct upon or to fill the aforesaid freshwater wetlands and intermittent stream.  These approvals

which the NFDSs require but do not have include site plan approval for a subparcel approximately 12 acres in size, upon which approximately 5 acres of the site's 7.54 acres of freshwater wetland is situated.

251.    In addition, the NFDSs require a building permit, which must be issued by the Town of Lancaster as a precondition to commencing construction.  No building permit has been issued for construction or other site work with respect to any part of the site's 7.54 acres of freshwater wetlands.

252.    Defendants BVG and NEC purport to be the developers of the premises in question.

253.    Virtually all of the freshwater wetlands (approximately 7 acres of the entire site's 7.54 acres) are situated on a subparcel approximately 21 acres in size presently owned by Defendants John and Carolyn Martzolf.

254.    The NFDSs have not commenced construction on or filling of the wetlands in question.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

255.    The Congress of the United States of America has enacted the Federal Water Pollution Control Act Amendments [of 1972], better known as the "Clean Water Act" (sometimes referred to herein as the "CWA"), which are codified at 33 USC §§1251 *et seq*.

256.    In response to widespread degradation of the nation's waters, Congress began enacting legislation in the 1940's to help protect and restore the watersheds, wetlands and estuaries flowing through the United States.

257.    Congress expanded upon earlier legislation in 1971 to pass the Federal

Water Pollution Prevention Act that is in place today (the "Clean Water Act," "CWA" or "the Act"), establishing as an objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. §1251(a).

258.    To achieve this objective, Congress declared that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."

259.    As part of its efforts to enable these goals and objectives of the CWA to be actualized, Congress made it illegal for persons and entities to discharge any pollutant into waters of the United States unless such discharge strictly complies with the Act.  33 U.S.C.A. §1311(a).

260.    Section 301 of the CWA prohibits the "discharge of any pollutant by any person" without a proper permit. See 33 U.S.C. § 1311(a). A "discharge" is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A "pollutant" includes solid waste, rock, and sand. 33 U.S.C. § 1362(6).

261.    There are two main permit programs under the Clean Water Act.

262.    One of the two main permit programs is established under §402 of the Act, 33 USC §1342, which requires permits for and regulates the discharge of pollutants from point sources into waters of the United States.

262.    The second main permit program is established under §404 of the Clean Water Act, which is codified at 33 USC §1344, and grants the Defendant Corps authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

263.    The term "navigable waters" is defined in 33 USC §1362 (7) to mean, in relevant part, "the waters of the United States."

264.    The Corps has defined "waters of the United States" in 33 C.F.R. section 328.3 to include the following:

(a)     The term *waters of the United States* means

(1)     All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
…

(5)     Tributaries of waters identified in paragraphs (a) (1) through (4) of this section;

…

(7)     Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1) through (6) of this section.

…

(b)     The term *wetlands* means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs, and similar areas.

(c)     The term *adjacent* means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands."

265.    Lake Erie and parts of the Buffalo River are waters of the United States within the meaning of 33 CFR §328.3(a)(1).

266.     There are three primary creeks that form the Buffalo River, one of which is Cayuga Creek.

267.     Upon information and belief, parts of Cayuga Creek are waters of the United States within the meaning of 33 CFR §328.3(a)(1)

268.     Those parts of Cayuga Creek which are not waters of the United States within the meaning of 33 CFR §328.3(a)(1) are all waters of the United States within the meaning of 33 CFR §328.3(a)(5) by reason of being a tributary of waters within the meaning of 33 CFR §328.3(a)(1) including those described in paragraph 43.

269.     The law is settled that the statute's definition of "waters of the United States" must be construed broadly, and extends to non-navigable tributaries, including human-made tributaries, including those three times removed from navigable rivers. *E.g., United States v. T.G.R. Corp.,* 171 F.3d 762, 764  (2d. Cir., 1999).

270.     Furthermore, the definition of "waters of the United States" encompasses "wetlands adjacent to waters as more conventionally defined." *Ibid.,* citing *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 133 (1985).

271.     The law is settled that the definition of "waters of the United States" encompasses intermittent streams and manmade ditches and culverts, including those that ultimately flow into navigable waters only during a significant rainfall.  *United States v. Eidson,* 108 F. 3d 1336 (11th Cir., 1997) and cases collected therein.

272.     The law is further settled that the definition of "waters of the United States" encompasses freshwater wetlands that are adjacent to the intermittent streams and other waters described in the foregoing paragraph.  See, e.g., cases collected in *U.S. v. Krilich*, 152 F. Supp. 2d 983, fn.13  (N.D. Ill., 2001).

273.     The freshwater wetlands described above are adjacent to an intermittent tributary stream

274.     Said tributary stream drains and discharges directly into the aforesaid Cayuga Creek via culverts running along and through the Transit Road right of way.

275.     The aforesaid Cayuga Creek constitutes waters of the United States by reason of being tributary to streams that ultimately flow into Lake Erie, which are navigable waters.

276.     Therefore, the aforesaid wetlands constitute waters of the United States under 33 CFR subsections 328.3(a) (1), (5) & (7), and under authority cited above.

**FIRST CLAIM FOR RELIEF:**
**DEFENDANTS HAVE FAILED TO OBTAIN NPDES/SPDES**
**INDIVIDUAL OR GENERAL PERMIT COVERAGE**
**FOR THEIR STORMWATER DISCHARGES INTO**
**WATERS OF THE UNITED STATES**

277.     Section 402 of the Act, 33 U.S.C. §1342, established a National Pollutant Discharge Elimination System ("NPDES") permit program.

278.     Section 402(a) of the CWA requires the prospective discharger of a pollutant to obtain a permit from the United States Environmental Protection Agency ("EPA") or the relevant state permitting authority before discharging the pollutant from a point source. See 33 U.S.C. §1342(a).

279.     A "point source" includes "any discernible, confined and discrete conveyance, including but not limited to any… ditch, channel, conduit, … [or] discrete fissure … from which pollutants may be discharged." 33 U.S.C. § 1362(14).

280.     In addition, §402(p) of the CWA requires entities to obtain discharge permits before discharging stormwater that contains pollutants. 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(6).

281.     Section 309(d) of the Act, 33 U.S.C. §1319(d), provides, in part, that any person who violates section 301 of the Act, 33 U.S.C. §1311, or any condition or limitation implementing §§301 (Effluent Limitations), 302 (Water Quality Related Effluent Limitations) or 308 (Records and Reports; Inspections) of the Act, 33 U.S.C. §1311, 1312 or 1318, among other provisions, as set forth in permits issued under section 402 of the Act, 33 U.S.C. §1342, shall be subject to a civil penalty not to exceed $25,000 per day for each and every such violation occurring before January 31, 1997, or not to exceed $27,500 per day for each and every such violation occurring after January 31, 1997.

282.     Pursuant to the Act, including sections 308 and 402(p) of the Act, 33 U.S.C. § 1318, 1342(p), the Administrator of EPA promulgated regulations setting forth the permit application requirements for storm water discharges. 55 Fed. Reg. 48,063 (Nov. 16, 1990). These regulations are codified at 40 C.F.R. § 122.26 ("storm water regulations").

283.     On November 16, 1990, EPA published regulations under the NPDES program which defined the term "storm water discharge associated with industrial activity" to include storm water discharges from construction activities, including clearing, grading, and excavation activities, that result in a disturbance of five or more acres of total land area. 40 C.F.R. § 122.26(b)(14)(x).

284.     These permits are issued by the EPA (i.e., the Environmental Protection Agency) or, in the alternative, by a state to which the EPA has delegated permitting authority.

285.     Stormwater discharge permitting, a category of NPDES permitting, for discharges  occurring in the State of New York is presently the responsibility of the New York State Department of Environmental Conservation.

286.     Discharges of stormwater from a construction site at which 5 or more acres is disturbed are specifically identified as discharges that require a permit.  See 33 C.F.R. §§122.1(b)(2)(iv) and 122.26(b)(14)(x).

287.     Discharges of stormwater from such a construction site in the absence of a permit is, therefore, a violation of the law.

288.     Pollutants at the site generated by construction include soils that wash and drain into freshwater wetlands and intermittent and perennial streams.  These materials contaminate water, increasing turbidity, and augmenting total suspended and dissolved solids.  These materials reduce water quality, contribute to fish mortality at downstream locations, and can impair freshwater wetland values and functions.

289.     After construction (stormwater controls for which are required by law) contaminants include chemicals such as fertilizers, pesticides, herbicides, brake dust, gasoline, oil and grease, and dust emanating from vegetated surfaces such as lawns, paved parking lots and driveways and building roofs.

290.     Heavy equipment used at the site is an additional source of water contamination.  Such equipment leaks.  Conveyers, loaders, vehicles and other equipment leak engine oil, diesel fuel, hydraulic fluid, lubricants and other toxic hydrocarbons onto

the ground surface of the facility.  As a consequence, copper, mineral oils, antifreeze, brake fluid, transmission fluid, diesel fuel, xylene, toluene, benzene, butadiene, gasoline, oil and grease, low pH water, and other pollutants are also discharged into the soil and nearby waters.

291.    While most of the Transit/William site is vacant, the non-federal Defendants commenced substantial site clearing activities on or about August 7, 2000.

292.    Said Defendants had received no form of government approval or permit for the site clearing activity; indeed, the SEQRA process was years away from being completed and the site clearing activity was in plain violation of SEQRA's implementing regulations, including 6 NYCRR §617.3

293.    In response, ten of the Plaintiffs above-named served "Notices of Intent Under Citizen Suit Provisions of Federal Water Control Act of 1973, as amended", on the non-federal Defendants or about August 31, 2000.

294.    Said Notices of Intent alleged that the non-federal Defendants lacked a NPDES/SPDES permit for their stormwater discharges from the project site.

295.    On or about November 17, 2000, NYSDEC advised Plaintiffs' counsel that Bella Vista Group and/or John and Carolyn Martzolf filed a document on or about October 5, 2000, entitled "Notice of  Intent" to be covered under NYSDEC's SPDES General Permit 93-06 governing stormwater discharges from construction activities.

296.    Thus, at no time prior to October 5, 2000 did any of the non-federal Defendants have a NPDES/SPDES permit under §402 of the Clean Water Act for site clearing or construction activities and stormwater discharges resulting therefrom at the project site.

297.     The site clearing activities disturbed more than five acres and/or were part of a common plan of development that has disturbed more than five acres and will disturb more than five acres in the future.

298.     Discharges of pollutants, including sand, dirt, and other construction related solid wastes entrained in stormwater have occurred at the project site during and following rain storms and snow melt events since August 7, 2000.  These discharges will continue on any day in which the rainfall and/or snow melt is sufficiently heavy.  These discharges are both direct and indirect to the waters of the United States, including, but not limited to, freshwater wetlands extant on and adjacent to the project site and tributaries to which such wetlands are adjacent, and other waters including an intermittent stream.

299.     The NFDS failed to obtain permit coverage at the site.

**PLAINTIFF'S SECOND CLAIM FOR RELIEF:**
**DISCHARGES OF POLLUTANTS**
**INTO WATERS OF THE UNITED STATES**
**CONTRARY TO 33 USC §1342 NPDES/SPDES PERMIT**

300.     Plaintiff repeats the foregoing allegations.

301.     The construction activities disturb more than five acres and/or are part of a common plan of development that has disturbed more than five acres and will disturb more than five acres in the future.  Discharges of pollutants, including sand, dirt, and other construction-related solid wastes entrained in stormwater have occurred from the construction site during rain storms since August 7, 2000.

302.     These discharges will continue on any day in which the rainfall, other precipitation or snowmelt  is sufficiently heavy.

303.    These discharges are both direct and indirect to the waters of the United

States, including, but not limited to, freshwater wetlands extant on the North America

Center and tributaries to which they are adjacent.

304.    The operators of the parcels upon which the violations are alleged to exist,

including the persons or legal entities which own or lease the aforesaid parcels, have not

properly completed and certified Notices of Intent on forms approved and provided by

the New York State Commissioner of Environmental Conservation (or his authorized

representative) relative to all activities regulated by the Clean Water Act relative to

stormwater discharges on the above-described parcels where the violations are alleged to

exist.

305.    The persons alleged to be in violation did not concurrently submit signed

copies of the aforesaid Notice of Intent ("NOI") to the municipality having  jurisdiction

and/or regulatory control over construction on the above-described parcels, pursuant to its

power of discretionary zoning approvals including, without limitation, site plan approval

and special use permits.

306.    The aforesaid owners and operators (hereafter the "aforesaid operators"),

have not developed stormwater pollution prevention plans at each site purported to be, or

required to be, covered by a SPDES General Permit.  The stormwater pollution

prevention plan is hereafter referred to as a "SWPP."  Furthermore, the aforesaid

operators failed to prepare the SWPP in accordance with good engineering practices,

identifying all potential sources of pollution which may reasonably be expected to affect

the quality of stormwater discharges, and describing and insuring the implementation of

practices that will be used to reduce the pollutants in stormwater discharges and to insure

compliance with the terms and conditions of a SPDES General Permit for stormwater discharges.  The aforesaid operators have not insured that all contractors and subcontractors who performed professional services at the site provide certification of a pollution prevention plan as required by NYSDEC SPDES General Permit GP-93-06 and its successor provisions and versions.

307.    The aforesaid operators have failed to keep the SWPP current, accounting for changes in design, construction, operation or maintenance, and has proven to be ineffective in eliminating or significantly minimizing pollutants and/or achieving the general objectives of controlling pollutants in stormwater discharges in construction activity, and in identifying any new contractor and/or subcontractor that will implement any measures of the SWPP.

308.    The SWPP is not prepared and/or implemented in accordance with Appendix F of the NYSDEC SPDES General Permit GP-93-06 and its successors. Deviations from Appendix F and other requirements listed in the General Permit are not explained and justified.  Particular deficiencies include:  the nature of the construction activity is not described, the intended sequence of major activities which disturb soils from major portions of the site is not accurately described, estimates of the runoff coefficient of the site after construction activities are completed is absent, as is existing data describing the soil and the quality of any discharges from the site, and a site map indicating drainage patterns and approximate slopes anticipated after major grading activities, areas of soil disturbance, an outline of areas which will not be disturbed, the location of major structural and non-structural controls identified in the plan, the location of areas where stabilization practices are expected to occur, surface waters (including

wetlands) and locations where stormwater is discharged to surface or groundwaters, is all absent.

309.    Upon information and belief, the SWPP does not provide background information in the detail required by Appendix F, Part I to the NYSDEC SPDES General Permit No. GP-93-06 (and successors).  Furthermore, it does not adequately compare pre-development with post-development runoff, using methodologies identified in Appendix F, Part II.A and presenting calculations, including pollutant loading calculations, under Part II.B of Appendix F.  Furthermore, the SWPP does not comply with the stormwater management criteria required in Part III of Appendix F of the aforesaid SPDES General Permit.  For example, and without limitation, proposed stormwater management facilities, by sub-catchment, are not shown.  The operators have never accurately and in good faith evaluated the amount of treatment or level of pollutant reduction that can be expected from their proposed stormwater management facilities, and have not considered specialized measures that can be used to remove sediment, oil-based products and other contaminants found in urban runoff.  The SWPP also fails to accurately identify stormwater conveyance systems conforming to actual construction.

310.    The SWPP fails to depict by description and map the temporary erosion and sediment control facilities and their implementation schedule, as well as similar information for permanent erosion and sediment control facilities.  Also, the aforesaid operators have failed to implement structural practices necessary for common drainage locations that serve an area with ten or more disturbed acres at one time.

311.    The aforesaid operators have failed to conform to "erosion and sediment control guidelines for new development" specified in Appendix E to the NYSDEC SPDES General Permit No. GP-93-06.

312.    The aforesaid operators have failed to conform to the stormwater management guidelines for new development specified in Appendix D to NYSDEC SPDES General Permit No. GP-93-06, including, without limitation, adequately controlling the "first flush," achieving peak flow attenuation, constructing runoff conveyance systems, and conforming to the hierarchy for methods of managing stormwater quality, and incorporating stormwater management adjuncts into post-development design as well as during construction.

313.    At the site, stormwater from several acres of exposed soil flows without controls, erosion control measures, detention basins, or other measures to filter this stormwater, and discharges from the construction site directly into freshwater wetlands, tributaries to which the wetlands are adjacent, and an intermittent stream that drains the site.

314.    At another location on the construction site, controls have been removed so that stormwater washing off large stockpiles of soil washes directly into one or more grated storm sewers along Transit Road, where it is channeled and, upon information and belief, discharges directly into Cayuga Creek.

315.    At other locations, erosion control measures such as silt fencing have been removed over lengths of hundreds of yards, so that stormwater washing off exposed soils runs off the site without any controls at all, and ultimately into waters of the United States.

**PLAINTIFF'S THIRD CLAIM FOR RELIEF:
USACE'S CWA §404 PERMIT WAS IMPROPERLY GRANTED
BECAUSE NEC'S TWO APPLICATIONS FOR CWA §401
CERTIFICATION FROM NEW YORK STATE WERE INCOMPLETE,
AND REMAINED SO THROUGHOUT THE PERMITTING PROCESS,
AND THEREFORE WAS NOT A "REQUEST" WITHIN THE
MEANING OF THE CLEAN WATER ACT SUFFICIENT TO
START THE ONE YEAR TIME PERIOD AFTER WHICH
A STATE'S RIGHT TO CERTIFY IS DEEMED WAIVED,
AND THE CORPS' DETERMINATION THAT
NEW YORK STATE DID WAIVE ITS RIGHT TO CERTIFY
WAS ARBITRARY, CAPRICIOUS AND CONTRARY
TO LAWFUL PROCEDURE**

316.    Section 706(2)(A) of the APA empowers citizens to petition the Court to set aside an agency action or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

317.    Section 401 of the CWA mandates that before a federal agency approves a license or permit authorizing an activity that may result in a discharge into navigable waters, the applicant for the license or permit must obtain and provide the agency with certification by the relevant state that the contemplated activity is consistent with the attainment of applicable water quality standards. 33 U.S.C. § 1341(a)(1). Section 401 provides as follows:

> Any applicant for a Federal license or permit. . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates. . . that any such discharge will comply with the applicable provisions of section 1311, 1312, 1313, 1316, and 1317 of this title. . . . No license or permit shall be granted until the certification required by this section has been obtained or has been waived [due to delay by the state] . . . .

33 U.S.C. § 1341(a)(1) (emphasis added).

318.    Upon receipt of a party's request for certification under section 401, the certifying state agency, which in New York is the New York State Department of Environmental Conservation ("NYSDEC") may grant, conditionally grant, deny, or waive such certification. See 33 U.S.C. §§1341(a)(1), 1341(d).

319.    A certifying state agency may impose conditions as necessary to ensure that the contemplated activity will be conducted in a manner that will not prevent affected waters from meeting water quality standards. 33 U.S.C.§1341(d).

320.    Conditions imposed by a certifying state agency become part of the license or permit. 33 U.S.C.§1341(d).

321.    In this case, the federal license or permit sought by NEC was a "fill" permit from USACE pursuant to §404 of the Act, 33 USC §1344.

322.    Section 404 of the CWA empowers the United States Army Corps of Engineers (the "Corps") to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. §1344(a).

323.    Prospective dischargers of dredged or fill material into wetlands must obtain a permit from the Corps prior to the discharge. 33 U.S.C. §§1344(a).

324.    Federal permitting agencies, such as USACE, are powerless to grant federal permits requiring state water quality certification, unless and until the relevant state agency has issued the water quality certification or waived same, and whether a waiver has occurred is determined by whether the state has failed or refused to act within a reasonable period of time (not to exceed one year) *after receipt of such request* for water quality certification:

> . . . If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request

> for certification, within a reasonable period of time
> (which shall not exceed one year) after receipt of
> such request, the certification requirements of this
> subsection shall be waived with respect to such Federal
> application.  No license or permit shall be granted until
> the certification required by this section has been
> obtained or has been waived as provided in the
> preceding sentence.

33 USC §1341.

325.   In this case, the developer Defendants made three arguable requests for §401 water quality certification.

326.   The first request was for certification of discharges arising from the filling of 2.03 acres of delineated freshwater wetlands at the project site, and was by way of a Joint Application For Permit made on behalf of one of the Defendants, Bella Vista Group, Inc.

327.   The Joint Application For Permit, seeking a Clean Water Act §404 permit from USACE and Clean Water Act §401 water quality certification from NYSDEC, stated that the "Project Description Proposed Purpose" was as follows:

> The proposed retail development project will
> necessitate the use of 2.03 acres of federal
> wetlands.

328.   USACE advised BVG that USACE was unable to process the request because the wetlands delineations submitted by BVG's consultants were inaccurate and materially understated the size of regulated freshwater wetlands present on the site, and for other reasons.

329.   NYSDEC determined that the application for §401 water quality certification was incomplete and could not be processed until certain necessary

information, including the wetlands mitigation proposal intended to compensate for the fill in of wetlands on the project site, was provided.

330.     Indeed, on December 16, 1999, USACE represented in writing to the Town of Lancaster (which was entertaining a rezoning application) that USACE had yet to receive an application for the project.

331.     On or about January 13, 2000, BVG forwarded to USACE a document entitled "Application for Freshwater Wetlands Permit for the Northeast Corner of Transit Road and William Street for the Town of Lancaster, Erie County, State of New York," referencing Department of the Army application No. 2000-00325(0).

332.     The application characterized the nature of the project's discharges needing §401 water quality certification as the discharge of filtered stormwater into the existing drainage system:

> [a] detention facility will be developed to control stormwater run-off from a 100-yr storm frequency and provide for filtering the stormwater before it enters the existing drainage system.

333.     Defendant BVG withdrew its application, and this was memorialized in February 16, 2000 correspondence by Ms. Bridget E. Brown of USACE:

> Reference is made to our recent meeting regarding the proposed development of the parcel located at Transit and William in the Town of Lancaster, Erie County, New York.  It was determined that you would not be able to provide the information necessary for me to continue processing of your Department of the Army permit application in a timely manner. Pursuant to our conversation, I have withdrawn your application.  A copy of your permit application has been retained for future reference.  Once the required information is submitted to our office, your application will be reactivated.  Please reference Processing No. 2000-00325(0) on all future submittals.

334.    Defendant Bella Vista Group, Inc. never reapplied for a Clean Water Act §404 permit or Clean Water Act §401 water quality certification relative to the project site.

335.    On September 13, 2000, Defendant NEC William Transit, LLC made a "Joint Application For Permit," seeking a CWA §404 and CWA §401 water quality certification for the project site, stating its intention to develop a "36± acre site that would result in the filling of 7.5± acres of Federal wetlands."

336.    In New York, CWA §401 water quality certifications are issued by NYSDEC.  Authority to do so is found at 6 NYCRR §608.9.

337.    NYSDEC has established uniform review procedures for major regulatory programs, pursuant to Article 70 of the Environmental Conservation Law.

338.    These uniform procedures govern, *inter alia*, applications for CWA §401 water quality certification.

339.    Under its uniform procedures, NYSDEC reviews application documents shortly after they are submitted to determine if an application is complete.

340.    A "complete application" is what triggers the commencement of NYSDEC review under the uniform procedures.

341.    Conversely, when an application is incomplete, NYSDEC does not review it.

342.    The term "complete application" is defined by statute:

> "Complete application" shall mean an application for a permit which is in an approved form and is determined by the department to be complete for the purpose of commencing review of the application but which may need to be supplemented during the course of review as to matters contained in the application in order to

> enable the department to make the findings and
> determinations required by law.  A complete application
> shall include such draft impact statement as may be
> required pursuant to article eight of this chapter.

En. Con. Law §70-0105 subd. 2.

343.   NYSDEC implements its obligation to establish uniform review procedures under En. Con. Law Article 70 through regulations it has promulgated, including those at 6 NYCRR Part 621, entitled "Uniform Procedures."

344.   The definition of "Complete Application" set forth in 6 NYCRR §621.1(d) is identical to the first sentence of the aforesaid statutory definition.

345.   Furthermore, NYSDEC regulations require the following for requests for water quality certifications under §401 of the Clean Water Act:

> A complete application must include a written statement
> requesting issuance of a 401 certification; *a copy of the
> properly completed application and supporting information
> for the Federal permit requiring the certification,* if
> required by the commissioner; and properly completed
> applications for any department permits which may be
> required in connection with the project.  The latter must
> satisfy the general requirements of section 621.3 of this Part.

346.   On October 3, 2000, NYSDEC informed Defendant NEC Transit William, LLC that its project was incomplete.

347.   Among the reasons for deeming the project incomplete were the following:

- That the location and size of on-site federal wetlands needed to be depicted and verified by USACE.

- That an off-site mitigation plan acceptable to USACE needed to be documented.

- That NYSDEC needed confirmation that there will be no adverse impact to archeological or historical resources located on both the project and mitigation sites.

348.    On December 22, 2000 NYSDEC acknowledged receipt of additional information from NEC Transit William and issued yet another Notice of Incomplete Application.  The supporting reasons included the need to complete an archeological reconnaissance survey over approximately 20 acres of the site and the need to ascertain what off-site mitigation plan, acceptable to USACE, was being proposed.

349.    On or about May 7, 2001, NEC withdrew its September 13, 2000 "Joint Application For Permit" seeking a CWA §404 permit and CWA §401 water quality certification.

350.    NEC's next "Joint Application For Permit" was filed on or about August 20, 2001.

351.    The August, 2001 application and supporting documents represented that the "waters of the United States" into which there would be a discharge requiring CWA §401 water quality certification would be the "existing wetland in the north and west portion of the [project] site."

352.    The August, 2001 application represented that the nature of the discharge would be purified stormwater runoff treated by a detention pond and a created shallow depressional wetland having a maximum of 6 inches of inundation.

353.    On October 9, 2001 the New York State Department of Environmental Conservation ("NYSDEC"), Region 9, by Regional Permit Administrator Steven J. Doleski, wrote to Defendant NEC, acknowledged receipt of its revised application for water quality certification associated with filling 7.54 acres of federal wetlands, and advised Defendant NEC that the application "remains incomplete" pursuant to

NYSDEC's "Uniform Procedures" set forth in Title VI of the New York Code of Rules and Regulations.

354.     NEC elaborated upon its intentions respecting the a) nature of the effluent being discharged and b) the location of waters of the United States into which discharges would be made through a document entitled "Supplemental Draft Environmental Impact Statement" or "SDEIS" which it submitted to state and local agencies including NYSDEC.

355.     The SDEIS stated:

> . . . due to the change of land cover to largely impervious state, all but a small portion of the storm water on site will be conveyed through the proposed storm water detention basin . . .
>
> The proposed detention basin will include two small plunge pools and a polishing pool.  . . . The basin will be designed to provide extended detention, which will enhance water quality by removing total suspended solids (TSS) and allowing particulates and associated pollutants to settle.  The basin will be graded so that water flows toward the polishing pool.
>
> The polishing pool will be similar to a wetland environment in that it will sustain compatible plant species.  Wetlands provide water quality benefits by such mechanisms as trapping sediment, chemical adsorption and uptake, and microbial decomposition.
>
> . . . Water from the polishing pool then will be directed by gravity flow to two regulated culverts.  A maximum of 20 cfs will be conveyed to existing wetlands located to the west of the basin.  This flow is to simulate existing conditions where 15 cfs from an offsite detention basin and a small portion of the runoff from the existing site currently flow to this wetland. the remainder of the flow will be conveyed to a proposed replacement wetland that will be located to the north of the proposed detention basin . . .

356.   In late 2001, the Applicant and reviewing agencies ascertained that the location of the proposed created, artificial wetland on the northern mitigation parcel was already occupied by freshwater wetlands.

357.   As a result, the Applicant acknowledged that it would not construct artificial wetlands at the location.

358.   The Applicant, at that time, proposed no alternative discharges into waters of the United States requiring CWA §401 water quality certification.

359.   NYSDEC specifically identified the inconsistencies between what was proposed and the Joint Application For Permit and what was proposed by the Applicant in its SDEIS, and alerted the Applicant to the need to amend its Joint Application For Permit in order to request that which it was actually proposing:

> 1.  According to the SDEIS, the northern mitigation parcel would consist of a combination "wetland creation, wetland preservation and mature upland forest preservation".  Since it has subsequently been determined that a large portion of this site already consists of federal wetlands, it is now proposed that the northern mitigation site would only consist of preservation of the existing ecotypes, and not include wetland creation.  ***This item should also be changed in the Joint Application for Permit to this Department and the COE.***

Emphasis added.

360.   Even though NEC submitted a document approximately one month later entitled "Proposed Wetland Mitigation Plan for the Gateway Centre, Town of Lancaster, Erie County, New York," which represented NEC's intention to use the northern mitigation parcel for preservation purposes, the proposed wetland mitigation plan made no reference to altering the character or quantity of discharges from project development

generally and wetlands filling in particular, when compared to that described in the original application and the SDEIS.

361.    On several later occasions in the year 2002, USACE requested the Applicant to disclose its intentions as to the location, quantity and quality of stormwater discharges from the developed project site, particularly for the purpose of securing an adequate amount of flow to the off-site wetlands that were proposed to be preserved.

362.    For example, on July 17, 2002 the Applicant, for the first time, indicated orally (at a meeting in which NYSDEC was *not* in attendance) that it wanted to separate on-site stormwater from off-site, upgradient stormwater discharges, channeling the latter into the preserved wetlands, and discharging the former into Cayuga Creek via a storm sewer alongside Transit Road.

363.    NEC never requested NYSDEC to issue a CWA §401 water quality certification relative to the discharge of stormwater from the project site (including the buildings and pavements proposed to be constructed in order to fill approximately 7.5 acres of existing freshwater wetland on the site) into Cayuga Creek.

364.    When USACE issued its CWA §404 permit to NEC in January, 2003, it authorized a discharge of contaminated stormwater that materially differed from those for which NEC made application to NYSDEC for CWA §401 water quality certification.

365.    Despite the fact that NEC did not request §401 certification from NYSDEC for the discharge ultimately approved, USACE deemed NYSDEC as having "waived" its right to issue a CWA §401 water quality certification.

366.    On September 25, 2002, as Bridget Brown of USACE corresponded via

e-mail with Mr. Steven Doleski, Regional Permit Administrator, and Mr. Charles

Cranston, both of NYSDEC Region 9, stating:

> I checked our regulations regarding the waiver of
> the WQC. **WQC is waived after 1 year from our
> public notice date.** The only way this time frame is
> altered is if you are formally requested to stop review
> by Corps of applicant. **Since we never requested you to
> stop your review, the time frame has expired. I will
> send you a written letter when I receive SHPO clearance.**

367.    On November 6, 2002, USACE wrote to NYSDEC a letter

memorializing USACE's position stated in the aforesaid September 25, 2002

communication, stating, in relevant part:

> In accordance with Title 33 of the Code of Federal
> Regulations Part 325.2(b)(1), "a Section 401 Water
> Quality Certification (WQC) waiver will be deemed
> to occur if the certifying agency fails or refuses to
> act on a request for certification within sixty days
> after receipt of such a request unless the district
> engineer determines a shorter or longer period is
> reasonable for the state to act . . . not to exceed one
> year" (See enclosure). **A request for WQC for the
> proposed project was received by your office on
> December 29, 2000. Project related impacts have
> not changed since the original request and more than
> one year has passed since your receipt of the request.
> Therefore, a waiver of the WQC is deemed to have
> occurred.**

Emphasis added.

368.    The above quoted statement of USACE that, in substance, NYSDEC

received a request for water quality certification on December 29, 2000 was in reference

to the December 29, 2000 "public notice" which USACE issued with respect to an earlier

version of the permit application.

369.    The determination of USACE that the maximum one year period of time

within which a state may act on a request for certification before being deemed as having

waived such right to grant a certification was arbitrary and capricious and contrary to lawful procedure and otherwise violative of the Administrative Procedure Act because the purported "requests" for certification made by the Applicants on the "Joint Application For Permit" form, and by supporting documentation, were incomplete and insufficient to permit NYSDEC review, and therefore did not constitute legally sufficient "requests" within the meaning of the statute, 33 USC §1341.

370.    The determination of USACE that the maximum one year period of time within which a state may act on a request for certification before being deemed as having waived such right to grant a certification was arbitrary and capricious and contrary to lawful procedure and otherwise violative of the Administrative Procedure Act because USACE's issuance of a "public notice" under 33 CFR §325.3 is not the making of a "request" within the meaning of the statute, 33 USC §1341.

371.    The determination of USACE that the maximum one year period of time within which a state may act on a request for certification before being deemed as having waived such right to grant a certification was arbitrary and capricious and contrary to lawful procedure and otherwise violative of the Administrative Procedure Act because NEC withdrew its Joint Application For Permit referenced in the December 29, 2000 public notice.

**PLAINTIFF'S FOURTH CLAIM FOR RELIEF:
USACE'S ISSUANCE OF A CWA §404 PERMIT
WAS CONTRARY TO LAWFUL PROCEDURE
BECAUSE IT FAILED TO OBTAIN CWA §401
CERTIFICATION FROM NEW YORK STATE;
INDEED, NEC'S PROJECT MODIFICATIONS
MATERIALLY CHANGED ITS PROPOSED
DISCHARGE AND IT NEVER REQUESTED
§401 CERTIFICATION FROM NEW YORK STATE
FOR THE DISCHARGES USACE ULTIMATELY APPROVED**

372.     Plaintiffs repeat and reallege the foregoing.

373.     It is elemental that in order for a state to waive its right to issue a CWA §401 water quality certification it must first receive a "request" within the meaning of the statute for the certification, and a reasonable period of time (not to exceed one year) must elapse following receipt of such request.

374.     CWA §401 water quality certifications are for the purpose of determining whether discharges into navigable waters of the United States from activities requiring Federal licenses or permits are in compliance with 33 USC §§1311, 1312, 1313, 1316 & 1317.

375.     "Navigable waters" is defined by statute to mean all "waters of the United States," which, in turn, is defined to mean navigable waters, tributaries of navigable waters (including intermittent streams) and freshwater wetlands that are adjacent to such navigable waters and tributaries.

376.     Cayuga Creek, NEC's proposed recipient of stormwater discharges, is either navigable in fact or is a tributary to other waters of the United States that are navigable in fact, including the Buffalo River.

377.     The application which NEC made in the year 2000 (which was subsequently withdrawn) and the subsequent application which NEC made in 2001 did not request certification from NYSDEC of discharges of contaminated stormwater into Cayuga Creek.

378.     The discharges for which NEC sought certification in its 2000 and 2001 applications were for the discharge of purified stormwater into an existing freshwater wetlands complex located to the west and north of the project site.

379.    While both the year 2000 and 2001 applications sought a permit from USACE to fill substantially all of the 7.54± acres of federal jurisdictional wetlands on the project site, the discharges into waters of the United States for which certification was sought differ materially from the discharges ultimately approved by USACE and intended to be utilized by NEC.

380.    Specifically, NEC's applications which sought certification of discharges into federal jurisdictional wetlands, and not into Cayuga Creek, such as is now the case.

381.    Also, NEC, for the purpose of purifying the site-generated stormwater which would be discharged into freshwater wetlands, proposed a fairly elaborate set of engineered features, including a pond providing for extended detention, the creation of a shallow emergent marsh, as well as other measures scientifically calculated to filter and improve the water quality of the site-generated stormwater discharges.

382.    However, under the plans approved by USACE and intended to be implemented by NEC, the site-generated stormwater (including that from the buildings and pavement proposed to be placed on the 7.54 acres of wetlands that will be filled), will receive minimal filtration, consisting primarily of a short residence time in a primative detention basin, and will be discharged directly into Cayuga Creek via a 6,000 foot long storm sewer providing no form of water treatment.

383.    Therefore, the location of the receiving waters has been changed, as has been the water quality of the effluent being discharged.

384.    NEC never made a formal, written request of NYSDEC for CWA §401 water quality certification of the stormwater effluent proposed to be discharged into Cayuga Creek.

385.    Therefore, NEC did not "request" CWA §401 water quality certification within the meaning of the statute, and therefore it was arbitrary, capricious and contrary to lawful procedure for USACE to consider NYSDEC as having waived its right to issue §401 water quality certification.

386.    To this date, NEC has not requested CWA §401 water quality certification from NYSDEC for the discharges it actually proposes to conduct, furthermore, NEC has not even informally disclosed to NYSDEC its intentions.

387.    Under 33 USC §1341, USACE was powerless to grant NEC's CWA §404 permit application because NEC did not lawfully request certification from NYSDEC nor did NYSDEC waive its right to certify the discharges actually being proposed.

**PLAINTIFFS' FIFTH CLAIM FOR RELIEF:
USACE'S ISSUANCE OF A CWA §404 PERMIT
WAS ARBITRARY, CAPRICIOUS AND
CONTRARY TO LAWFUL PROCEDURE BECAUSE
IT WAS ISSUED IN CONTRAVENTION OF
CWA §404 (b) (1) GUIDELINES ADOPTED BY USEPA**

388.    Plaintiffs repeat and reallege the foregoing allegations.

389.    It is documented that between the 1780s and 1980s the wetland area in the contiguous United States had decreased to approximately 53% of what it had been in the 1780s.

390.    The Clean Water Act's principal objective is "to restore and maintain the chemical, physical and biological integrity of the nation's waters.  Both USACE and USEPA define the "waters of the United States" to include most wetlands.  By 1989, it was declared presidential policy that "no net loss" of wetlands was a national goal.

391.    The primary regulatory tool ensuring protection of the nation's wetlands is §404 of the Clean Water Act, under which USACE has authority to issue permits and to decide whether to attach conditions to them.

392.    Under CWA §404, permits are required for the discharge of dredged or fill material into waters of the United States.

393.    CWA §404 permits are obtainable from the Secretary of the Army, acting through the Chief of Engineers.

394.    Even though USACE is responsible for issuing CWA §404 permits, it must do so in compliance with "guidelines" developed by USEPA, pursuant to CWA §404(b)(1), 33 USC §1344(b)(1).

395.    Such "guidelines" were promulgated by way of regulations having force of law, and are codified at 40 CFR Part 230.

396.    40 CFR §230.1 presents "purpose and policy" underlying the §404(b)(1) guidelines, among them:

> (a)  The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material.
>
> . . .
>
> (d)  From a national perspective, the degradation or destruction of special aquatic sites, *such as filling operations in wetlands,* is considered to be among the most severe environmental impacts covered by these Guidelines.  The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.
>
> . . .

Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have no adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1)  For the purpose of this requirement, practicable alternatives include but are not limited to:

 (i)  Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

 (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2)  An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.  If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

397.    Furthermore, when the Applicant proposes to discharge fill at a special aquatic site, for example, a freshwater wetland, and the activity for which application is made is not "water dependent," USEPA's Guidelines specify that a presumption exists that practicable alternatives do exist and that discharges at alternative locations that are not a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, both unless clearly demonstrated otherwise.  40 CFR §230.10(a)(3).

398.    NEC has failed to clearly demonstrate that there are no practicable alternatives, and the determination of USACE that NEC has demonstrated the absence of practicable alternatives is arbitrary, capricious and contrary to lawful procedure.

399.    Among the reasons, without limitation, are:

- Defendant NEC's misrepresentations to USACE concerning the size of its investment and the area of land that it had purchased, both of which were materially overstated yet relied upon by USACE in making this determination.

- Defendant NEC's misrepresentation that there was a commitment to build a second "big box" retail store on the site.  Upon information and belief, there was no such commitment, and, assuming *arguendo* one existed, it ceased to exist at the times relevant hereto, including the date that NEC made its application and the date that NEC received its permit.

- Defendant NEC's misrepresentations respecting the existence of marketing studies showing that its proposed tenants, including an unrevealed "national home improvement" chain store, had performed marketing studies demonstrating that their facilities had to be constructed on Transit Road between William Street and French Road, and at no other location.

- Defendant NEC's "practicable alternatives" analysis consisted of only four alternative locations, three of which were clearly too small to provide an alternative, and the other one of which is essentially undevelopable due to the predomination of freshwater wetlands, and was therefore skewed in favor of a pre-determined result and failed to meet the level of detail required under the Guidelines.

- USACE simply accepted Defendant NEC's representations concerning the area of land that it had purchased, the expenditure it had made to purchase such land (much of which it has not, in fact, purchased), the results of marketing studies, etc., as to facts material to rendering a determination that no practicable alternatives existed.  USACE's acceptance of these self-serving, unproven representations of fact made by NEC was arbitrary, capricious, inherently unreliable and contrary to lawful procedure.

400.    Upon information and belief, there were no marketing studies conducted showing that Wal Mart and the unspecified national home improvement chain store could not earn a reasonable economic return were they to invest in locations elsewhere in western New York on alternative sites that are practicable and include little, if any, freshwater wetlands subject to USACE regulation.

401.    The majority of the freshwater wetlands which Defendant NEC proposes to fill, and for which it has received a CWA §404 permit, are located on a portion of the site that cannot be developed until a subsequent phase, and requires various discretionary government approvals.

402.    Defendant USACE accepted outright Defendant NEC's unproven and factually unsupported assertion that it could not earn a reasonable return on its investment without filling the majority of the wetlands in the course of building a second phase of the project.

403.    Defendant NEC claimed that it had expended a large sum of money to purchase the vacant land upon which the majority of freshwater wetlands were situated, and that it could not recoup the cost of its investment unless it could develop the vacant portion of that land at a second phase of development.

404.    These representations were false.

405.    These representations were not supported by reliable calculations or evidence.

406.    All of Defendant USACE's determinations respecting practicable alternatives, including USACE's determination that there was no practicable alternative to filling all the wetlands at the project site, and that there were no practicable alternative locations at all, and that it had no responsibility to look at off-site practicable alternative locations anywhere other than on a short stretch of Transit Road that is filled with parcels that are undevelopable because they are too small or covered with freshwater wetlands, were arbitrary, capricious and contrary to lawful procedure.

**PLAINTIFFS' SIXTH CLAIM FOR RELIEF:**
**CORPS §404 PERMIT ISSUANCE ARBITRARY**
**AND CAPRICIOUS FOR FAILURE TO COMPLY**
**WITH REGULATORY GUIDANCE LETTER 01-1**

407.    Plaintiffs repeat and reallege the foregoing.

408.    It is documented that between the 1780s and 1980s the wetland area in the contiguous United States had decreased to approximately 53% of what it had been in the 1780s.

409.    The Clean Water Act's principal objective is "to restore and maintain the chemical, physical and biological integrity of the nation's waters.  Both USACE and USEPA define the "waters of the United States" to include most wetlands.  By 1989, it was declared presidential policy that "no net loss" of wetlands was a national goal.

410.    The primary regulatory tool ensuring protection of the nation's wetlands is §404 of the Clean Water Act, under which USACE has authority to issue permits and to decide whether to attach conditions to them.

411.    Commonly, USACE has permitted the filling of wetlands for a broad range of development projects, usually requiring compensatory mitigation such as wetland restoration, creation, enhancement and, in exceptional cases, preservation of other wetlands.

412.    In response to concerns whether USACE was adequately implementing the §404 program and the nation's "no net loss" policy, the National Research Council/National Academy of Sciences established the Committee on Mitigating Wetland Losses, which prepared a report entitled "Compensating for Wetland Losses Under the Clean Water Act."

413.    In June, 2001, the National Research Council/National Academy of Sciences ("NRC/NAS") issued its report, which incorporated an executive summary which included many of the foregoing points made in this Claim.

414.    The NRC/NAS report presented five conclusions, which are:

- Conclusion 1:  The goal of no net loss of wetlands is not being met for wetland functions by the mitigation program, despite progress in the last 20 years.

- Conclusion 2:  A watershed approach would improve permit decision making.

- Conclusion 3:

- Conclusion 4:  Support for regulatory decision making is inadequate.

- Conclusion 5:  Third-party compensation approaches (mitigation banks, in lieu fee programs) offer some advantages over permittee responsible mitigation.

415.    In response to the NRC/NAS report's critique, USACE issued Regulatory Guidance Letter ("RGL") 01-1 dated October 31, 2001.

416.    In a contemporaneous press release on its website, USACE summarized the reasons for preparing RGL 01-1:

> . . . The June 2001 National Research Council/ National Academy of Sciences (NRC/NAS) report faulted the Corps' mitigation in several ways, including failure of mitigation projects, lack of planned mitigation projects being built, the Corps not taking a watershed approach to mitigation, and too much reliance on onsite mitigation, which often fails because of altered hydrology on the site where draining and filling aquatic areas occurs.
>
> . . .
>
> In response to the growing need for consistency in mitigating impacts to the aquatic environment in the Corps' regulatory program, the need for more rigor

in the permit conditions issued and follow-up
enforcement of permit conditions, and the need
for a watershed approach to requiring mitigation, the
Corps prepared RGL 01-1.

417.    RGL 01-1 §1(b), entitled "Applicability," states:

This guidance applies to compensatory mitigation
proposals submitted for approval on or after the
effective date of this guidance and to those in the
early stages of planning or development.  These
policies are not retroactive for mitigation projects
that have already received approval.

418.    As alleged above, the Applicants' year 2000 application proposed

mitigation only in the form of "preserving" wetlands in the Crabapple Lane subdivision

of Cheektowaga, lands which another developer had already committed to deed to the

Town of Cheektowaga for preservation purposes.

419.    The year 2000 mitigation proposal was roundly criticized by all concerned

agencies, plainly affronted the national "no net loss" of wetlands policy, and was not

incorporated in the §404 permit issued to Applicants.

420.    The forerunner of the mitigation proposal incorporated in USACE's §404

permit issued to NEC was contained in the application filed on August 20, 2001 with

USACE and NYSDEC.  For the first time, the Applicant proposed wetland creation on

the "Steinfeldt mitigation parcel."

421.    Also, at that time, the Applicant proposed acquisition of a much smaller

"northern mitigation parcel" than that proposed and included in the issued permit.

422.    Another significant difference between the August, 2001 application and

the approved application was that the former proposed wetland creation on the northern

mitigation parcel, a proposal that was dropped after Plaintiffs' wetlands consultant

advised USACE that the northern mitigation parcel contained high quality existing wetlands, and that the "creation" would result in replacing existing wetlands with wetlands having less quality.

423.    Another significant difference between the August, 2001 application and the §404 permit ultimately issued was that the former dispensed with the wetland restoration component at the Tonawanda Wildlife Management Area, while the latter requires it.

424.    Therefore, when RGL 01-1 became effective, on October 31, 2001, Applicant's mitigation proposal was incomplete and in early stages of formulation.

425.    The Applicants' compensatory mitigation proposals (except for the Steinfeldt mitigation parcel proposal) actually incorporated into the January, 2003 permit were submitted to USACE after the effective date of RGL 01-1

426.    As to the Steinfeldt mitigation parcel component of the Applicants' compensatory mitigation proposals, that was in the early stage of USACE review and, indeed, it underwent significant modification after the effective date of RGL 01-1.

427.    Therefore, the §404 permit application was subject to RGL 01-1 standards.

428.    However, USACE's permit application review significantly departed from the requirements of RGL 01-1.

429.    Under §2.A RGL 01-1, a "debit/credit assessment" is required.

430.    RGL 01-1 defines "debit" as follows:

> A unit of measure (e.g., functional capacity units in HGM) representing the gain of aquatic functions at an impact or project site; the measure of function is typically indexed to the number of acres lost or impact by issuance of the permit.

431.    RGL 01-1 defines "credit" as follows:

> A unit of measure (e.g., functional capacity units in HGM) representing the gain of aquatic functions at a compensatory mitigation site; the measure of function is typically indexed to the number of acres of resources restored, established, enhanced, rehabilitated or protected/maintained as compensatory mitigation.

432.    Nowhere in the EA/SOF or the record did USACE adopt credits or debits or assign them to the game of aquatic functions at compensatory mitigation site and the loss of aquatic functions at an impact or project site, respectively.

433.    RGL 01-1 requires preparation of a mitigation plan, and defines that to address 13 criteria.  Criterion B requires the development of replacement ratios that is consistent with the known difficulty and risk of replacement:  this criterion was not addressed in the NEC's application documents or by USACE.

434.    Criterion E requires disclosure of the source of water supply and, in some areas, a water budget, with respect to wetland mitigation.

435.    In this case, Plaintiffs' wetlands consultant, by reference to a USGS topographic map, identified the watershed of the Steinfeldt mitigation parcel, concluded that it was extremely small, and advised that a water budget would be needed to determine if the tiny watershed could sustain an adequate water supply for the wetlands the Applicant proposed to create.

436.    Notwithstanding this critique, which was provided to USACE, neither USACE nor NEC calculated a water budget or otherwise used objective or reliable methods to determine that runoff from the tiny watershed would support constructed wetlands.

437.    Criterion M requires a plan "outlining the short and long term management and maintenance of the mitigation site."  In this case, long term management and maintenance requirements for the three mitigation sites are not addressed.  Particularly with respect to the Steinfeldt site, which would be owned by the Town of Lancaster by the terms of the §404 permit's special conditions, this criterion can only be fulfilled by addressing long term management and maintenance needs and extracting an enforceable obligation from the municipality that it will bear the expense of same.  Otherwise, USACE (and the Court) may expect this mitigation proposal to continue the documented pattern of failed mitigation that prompted the serious criticism of USACE set forth in the NRC/NAS report "compensating for wetland losses under the Clean Water Act."

438.    RGL 01-1 requires that a permittee provide financial assurances (funds, performance bonds, irrevocable trusts, etc.) sufficient to cover contingency actions in the event of default by the party responsible for mitigation success or in the event of failure to meet the success criteria and that such financial assurances should be comparatively higher for those projects posing a greater risk of failure (e.g., no naturally occurring hydrology).  In this case, no financial assurances are provided for the Steinfeldt mitigation area.

439.    In this case, USACE's §404 permit would allow NEC to fill 7.54 acres of wetland years before the success of the Steinfeldt mitigation parcel could be assessed and contingencies satisfied, thus necessitating appropriate financial assurances.

440.    The §404 permit USACE issued in this case, therefore, runs afoul of RGL 01-1 which states:

In this regard, *the following minimum requirements should normally be satisfied prior to any construction* in aquatic areas under an issued permit:  (1)  the mitigation plans have been approved; (2)  the mitigation project site has been secured; (3)  a permanent source of adequate water is available; and *(4)  the appropriate financial assurances have been established.*

(Emphasis added).

441.   In summary, USACE's issuance of a §404 permit to NEC was arbitrary and capricious because it failed to assign credits and debits quantifying adverse effects and substantiating that beneficial effects adequately offset the adverse effects, because the mitigation work plan failed to address three criteria needed for adequate agency review, and because financial assurances were dispensed with for most aspects of compensatory mitigation, particularly wetlands creation at the Steinfeldt mitigation parcel.

442.   These deficiencies rendered permit issuance arbitrary and capricious.  This conclusion is reinforced by, but not dependent upon, USACE's failure to comply with RGL 01-1.

### RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

### Against The Non-Federal Defendants On Plaintiffs' First And Second Claims For Relief

A.     Issue a declaratory judgment that Defendants, have violated and continue to be in violation of §301 of the Federal Water Pollution Control Act, 33 U.S.C. §1311.

B.      Enjoin Non-Federal Defendants from any further construction, grading, site preparation, earth moving, excavation and filling upon the premises which are the subject of this action until said Non-Federal Defendants have obtained an individual permit from the New York State Department of Environmental Conservation pursuant to 33 USC §1342, and a water quality certification from said New York State Department of Environmental Conservation pursuant to 33 USC §1341, and from otherwise discharging pollutants from point sources into waters of the United States or  discharging dredged or fill material into waters of the United States, in such a manner as will result in further violations of the Act.

C.      Order Defendants to comply with the Act by providing the required information and by adopting appropriate measures to control the pollutants at the construction sites;

D.      Order Defendants to comply with the terms and conditions of permits at future construction sites, including, among other things, the development and implementation of a pollution prevention plan, the application of best management practices to minimize or eliminate discharges of pollutants from the site with storm water discharges, and the implementation of corporate policies designed to achieve and assure compliance with the law cited herein. Defendants should be required to demonstrate to NYSDEC, USEPA and to this Court that it has done so and will continue to do so over time;

E.      Permanently enjoin Defendants from failure to comply with the law cited herein, and in particular with the NPDES/SPDES program and NPDES/SPDES permit, and each term and condition of such permit;

96

F.      Authorize Plaintiffs and their agents or representatives to inspect and sample upon the premises which are the subject of this action, to verify whether Non-Federal Defendants have achieved compliance with the Act, with the costs of such inspection and sampling to be borne by Non-Federal Defendants.

G.      Order Non-Federal Defendants to provide Plaintiffs, for a period of two years, with a copy of all reports, permit applications, and other documents which Non-Federal Defendants submit to United States Environmental Protection Agency, United States Army Corps of Engineers  and/or New York State Department of Environmental Conservation regarding Non-Federal Defendants' discharges and/or NPDES/SPDES permits, contemporaneously with such reports, permit applications or documents being submitted to said authorities.

H.      Issue a remedial injunction ordering Non-Federal Defendants to pay the costs of any environmental restoration or remediation deemed necessary and proper by the Court to ameliorate the water degradation caused by Non-Federal Defendants' violations.

I.      Order Non-Federal Defendants to pay civil penalties of $27,500 per day of violation, for each violation under §§309(d) and 505(a) of the Act, 33 USC §§1319(d) & 1365(a), including those described above and violations committed subsequent to those identified in this Complaint.

J.      Award Plaintiffs their costs, including reasonable attorney and expert witness fees, as authorized by §505(d) of the Act, 33 U.S.C. §1365(d); and

K.      Award such other relief as this Court deems appropriate.

**Against The Federal Defendants On Plaintiffs Third,
Fourth, Fifth And Sixth Claims For Relief**

A.     A declaration that the federal Defendants violated §401 of the CWA, 33 U.S.C. § 1341, and APA §706(2)(A), 5 U.S.C. §706(2)(A), by approving NEC's application for a Clean Water Act §404 permit;

B.     An award of injunctive relief enjoining the non-federal Defendants from any further activity under the Clean Water Act §404 permit which USACE issued to Defendant NEC;

C.     A declaration that Defendant NEC violated §401 of the CWA by failing to obtain State certification to support it's applications for Clean Water Act §404 permits;

D.     A declaration that the Clean Water Act §404 permit which USACE granted to Defendant NEC on or about January 6, 2003 is void, without legal force or effect, and issued in contravention of the Clean Water Act and its implementing regulations, including, without limitation, the §404(b)(1) Guidelines promulgated by the United States Environmental Protection Agency.

E.     A decision to retain jurisdiction of this matter to ensure compliance with this Court's decree;

F.     An award of plaintiff's attorneys' fees, expert fees, and other costs; and

G.     Such other relief as the Court deems proper.

DATED:     Buffalo, New York
           April 29, 2004

                              s/David J. Seeger, Esq.
                              DAVID J. SEEGER, ESQ.
                              *Attorney for Plaintiffs*
                              69 Delaware Avenue, Suite 1100
                              Buffalo, New York  14202
                              716-856-1536